Judge Berman

'08 CIV 6709

Kennedy, Jennik & Murray, P.C.
Attorneys for Plaintiffs
113 University Place - 7th Floor
New York, New York 10003
(212) 358-1500
Thomas M. Murray (TM 6605)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DISTRICT COUNCIL 1707, AMERICAN
FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO,
and LOCAL 205, DISTRICT COUNCIL
1707, AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO,



**COMPLAINT**

                                     **Plaintiffs,**

             **-against-**

HIGHBRIDGE ADVISORY COUNCIL
FAMILY SERVICES, INC.

                             **Defendant.**

-----------------------------------------------------------------x

Plaintiffs, by their attorneys, Kennedy, Jennik & Murray, P.C., allege as follows:

## NATURE OF ACTION

1.      This is an action arising under § 301 of the Labor Management Relations Act, 29

U.S.C. § 185, and § 9 of the Federal Arbitration Act, 9 U.S.C. § 9, to confirm three arbitration

awards issued to remedy breaches by defendant of a collective bargaining agreement.

## JURISDICTION

2.     This court has subject matter jurisdiction pursuant to 29 U.S.C. §185 and 28 U.S.C. § 1331.

## PARTIES

3.     Plaintiffs District Council 1707, American Federation of State, County and Municipal Employees, AFL-CIO, and Local 205, District Council 1707, American Federation of State, County and Municipal Employees, AFL-CIO (referred to herein collectively as "DC 1707" or the "Union"), are labor organizations as defined by § 2(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(5), and maintain their principal place of business at 75 Varick Street, New York, New York 10013, in the County of New York, State of New York.

4.     Defendant Highbridge Advisory Council Family Services, Inc. ("Highbridge" or the "Employer") is an employer as defined by § 2(2) of the NLRA, 29 U.S.C. § 152(2), and maintains its principal place of business at 880 River Avenue, Bronx, New York.  Defendant is a private, non-profit childcare center.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

5.     At all times relevant to this action, the Employer and Union were parties to a collective bargaining agreement (the "CBA"), which provides, *inter alia*, that (1) employees shall not be terminated without just cause and (2) disputes concerning employee discipline, and other disputes concerning the parties' adherence to the terms and conditions of the CBA, are to be submitted to binding arbitration.  A copy of the CBA is annexed hereto as Exhibit 1.

6.    A successor CBA is being negotiated which will result in pay increases retroactive to April 1, 2006.

## FIRST CAUSE OF ACTION

7.    On August 19, 2005, an incident occurred at work, which the Employer reported to the New York State Office of Children and Family Services.  As a result, Margaret Murray ("Murray"), Adrian Jones ("Jones"), Tyrone Sylvester ("Sylvester") and Vivian Byrd ("Byrd") were "named as a subject" by the New York State Child Abuse and Maltreatment Register.  Murray, Jones, Sylvester and Byrd requested amendment of the record on file with the New York State Child Abuse and Maltreatment Register.  Ultimately, the reports were amended to reflect that Murray, Jones, Sylvester and Byrd were no longer identified as subjects of the report.  On August 20, 2005, the Employer suspended Murray and she was never reinstated.  On December 5, 2005, the Employer suspended Byrd, Jones and Sylvester, following an investigation of the same August 19, 2005 incident for which Murray was suspended.  Jones, Sylvester and Byrd were reinstated on August 1, 2006.

8.    Pursuant to the grievance procedures contained in the CBA, the Union filed a grievance alleging that Highland had breached the CBA and demanding that Murray be reinstated to her former position and that Byrd, Jones and Sylvester by made whole by receiving back pay and benefits they lost during their suspensions.

9.    Attempts to settle the Union's grievance were unsuccessful.

10.     In accordance with the terms of the CBA, the Union duly demanded arbitration of the dispute concerning Murray's termination and the back pay and benefits of Murray, Jones, Sylvester and Byrd.

11.     On October 19, 2007, arbitration hearings were held in New York, New York, under the auspices of the American Arbitration Association ("AAA") before Arbitrator Daniel F. Brent ("Arbitrator Brent"). Both parties were advised of the time, date, and place of the hearing. Counsel for the Employer advised Arbitrator Brent that the Employer would not appear at the hearing, whereupon Arbitrator Brent granted the Union's Motion to proceed *ex parte*. Arbitrator Brent issued an opinion and award in the case on November 16, 2007. A copy of the Arbitrator's opinion and award (the "Murray Award") is annexed hereto as Exhibit 2.

12.     Arbitrator Brent found that Murray had been completely exonerated from all charges underlying her suspension, and is therefore entitled to be made whole. Arbitrator Brent directed the Employer to pay to Murray $49,407.46, less customary payroll tax deductions. Arbitrator Brent also directed the Employer to pay Murray any retroactive wage increases that may be negotiated between the Employer and the Union.

13.     Arbitrator Brent found that Byrd, Jones and Sylvester were improperly deprived of earnings from the date of their suspension, December 5, 2005, through the date of their reinstatement, August 13, 2006.

14.     Arbitrator Brent directed the Employer to pay Jones $5,126.23.

15.     Arbitrator Brent directed the Employer to pay Sylvester $12,571.00 less an offset for any unemployment benefits he may have received during the interval of his suspension. Sylvester

received $2,203.00 in unemployment benefits during the time of his suspension. Therefore, under Arbitrator Brent's Award, Sylvester is owed $10,368.

16.    Arbitrator Brent directed the Employer to pay Byrd $3,094.83.

17.    The Employer has not complied with the Arbitrator's Award in any respect.

18.    Plaintiffs are therefore entitled to a judgment confirming the Arbitrator's Award and directing Defendant to pay Murray $$49,407.46, to pay Jones $5,126.23, to pay Sylvester $10,368.00, and to pay Byrd $3,094.83.


## SECOND CAUSE OF ACTION

19.    Linda Ferguson ("Ferguson") was suspended by the Employer on November 15, 2005 and terminated effective December 6, 2005, from her position with the Employer.

20.    Pursuant to the grievance procedures contained in the CBA, the Union filed a grievance alleging that the Employer had breached the CBA by terminating Ferguson without just cause and demanding that Ferguson be reinstated to her former position and that she be made whole by receiving back pay and benefits.

21.    Attempts to settle the Union's grievance were unsuccessful.

22.    In accordance with the terms of the CBA, the Union duly demanded arbitration of the dispute concerning Ferguson's termination, back pay and benefits.

23.    On December 1, 2006 and January 30, 2008, arbitration hearings were held in New York, New York, under the auspices of the AAA before Arbitrator Brent. Both parties were present and represented by counsel

24.    Arbitrator Brent issued an opinion and award in the case on February 7, 2008. A copy of the Arbitrator's opinion and award (the "Ferguson Award") is annexed hereto as Exhibit 3.

25.    Arbitrator Brent found that the Employer did not have just cause for the termination of Ferguson, and that her termination should be reduced to a 30-day unpaid suspension. Arbitrator Brent directed the Employer to made Ferguson whole for all lost wages or work opportunity between December 15, 2005 and August 6, 2006, less applicable offsets for unemployment benefit she received and any welfare or other payments she received.

26.    The Employer has not complied with the Arbitrator's Award in any respect.

27.    Plaintiffs are therefore entitled to a judgment confirming the Arbitrator's Award and directing Defendant to pay Ferguson consistent with the Arbitrator's Award.


**THIRD CAUSE OF ACTION**

28.    An incident occurred at the Employer's facility in November 2005, and as a result, employee Wallace Bright ("Bright") was indefinitely suspended, and his last day of work for the Employer was February 3, 2006.

29.    Pursuant to the grievance procedures contained in the CBA, the Union filed a grievance alleging that the Employer had breached the CBA by terminating Bright without just cause and demanding that Bright be reinstated to his former position and that he receive back pay and benefits lost.

30.    Attempts to settle the Union's grievance were unsuccessful.

31.    In accordance with the terms of the CBA, the Union duly demanded arbitration of the dispute concerning Bright's termination, back pay and benefits.

32.    On June 21, 2007, an arbitration hearing was held in New York, New York, under the auspices of the AAA before Arbitrator David L. Gregory ("Arbitrator Gregory"). The Employer did not appear, and the hearing proceeded *ex parte*. Arbitrator Gregory issued an opinion and award in the case on July 30, 2007. A copy of the Arbitrator's opinion and award (the "Gregory Award") is annexed hereto as Exhibit 4.

33.    Arbitrator Gregory found that Bright was terminated without just cause, and directed the Employer to reinstate him and expunge his penalty from the record. Arbitrator Gregory directed the Employer to award back pay to Bright from February 24, 2007, less interim earnings.

34.    The Employer has not complied with the Arbitrator's Award in any respect.

35.    Plaintiffs are therefore entitled to a judgment confirming the Arbitrator's Award and directing Defendant to pay Wallace Bright back pay consistent with the Arbitrator's Award.

### ACTION

WHEREFORE, Plaintiffs demand judgment:

1.    Confirming the arbitration award of Arbitrator Brent, dated November 16, 2007, and directing that judgment be entered thereon in this Court;

2.    Confirming the arbitration award of Arbitrator Brent, dated February 7, 2008, and directing that judgment be entered thereon in this Court;

3.    Confirming the arbitration award of Arbitrator Gregory, dated July 30, 2007, and directing that judgment be entered thereon in this Court;

4.    Awarding prejudgment interest at the rate of 9% for all monetary relief;

5.    Awarding plaintiffs' attorney's fees and costs; and

6.    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      July 28, 2008

                                  KENNEDY, JENNIK & MURRAY, P.C.
                                  Attorneys for Plaintiffs

                                  Thomas M. Murray (TM 6605)
                                  113 University Place, 7th Floor
                                  New York, New York 10003
                                  (212) 358-1500

# EXHIBIT

# 1

AGREEMENT

between

**LOCAL 205,
COMMUNITY AND SOCIAL AGENCY
EMPLOYEES UNION DISTRICT
COUNCIL 1707, A.F.S.C.M.E.,
A.F.L.-C.I.O.**

and

**DAY CARE COUNCIL OF
NEW YORK, INC.**

January 1, 2001 – March 31, 2006

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I. | RECOGNITION | 1 |
| ARTICLE II. | UNION SECURITY/CHECK OFF | 2 |
| ARTICLE III. | WAGE RATES | 2 |
| ARTICLE IV. | HOURS OF WORK | 6 |
| ARTICLE V. | VACATIONS | 7 |
| ARTICLE VI. | HOLIDAYS | 8 |
| ARTICLE VII. | SICK LEAVE | 8 |
| ARTICLE VIII. | EMERGENCIES, SHUTDOWNS AND RELOCATIONS | 9 |
| ARTICLE IX. | JURY DUTY | 10 |
| ARTICLE X. | LEAVES OF ABSENCE | 10 |
| ARTICLE XI. | HEALTH, SAFETY AND WELFARE | 11 |
| ARTICLE XII. | TERMINATION AND RESIGNATION | 12 |
| ARTICLE XIII. | UNION ACTIVITY | 12 |
| ARTICLE XIV. | SUBSTITUTES, TRAINEES AND TEMPORARY EMPLOYEES | 13 |
| ARTICLE XV. | GRIEVANCE AND ARBITRATION | 13 |
| ARTICLE XVI. | SAVINGS CLAUSE | 15 |
| ARTICLE XVII. | MANAGEMENT RIGHTS | 15 |
| ARTICLE XVIII. | SENIORITY | 15 |
| ARTICLE XIX. | JOINT LABOR MANAGEMENT COMMITTEE ON PRODUCTIVITY GAINS AND NEW FUNDING. | 17 |
| ARTICLE XX. | MISCELLANEOUS | 17 |
| ARTICLE XXI. | NON-DISCRIMINATION | 18 |
| ARTICLE XXII. | DURATION OF AGREEMENT | 19 |
| APPENDIX I | SCHEDULE OF MINIMUM RATES | 20 |

## AGREEMENT

By and between DAY CARE COUNCIL OF NEW YORK, INC. (hereinafter referred to as the "Council"), for and on behalf of those of its member Centers (hereinafter individually referred to as "Center" or "Employer") that have authorized the Council to represent them for the purposes of collective bargaining, and LOCAL 205, COMMUNITY AND SOCIAL AGENCY EMPLOYEES UNION, DISTRICT COUNCIL 1707, A.F.S.C.M.E., AFL-CIO (hereinafter referred to as the "Union").

### WITNESSETH:

WHEREAS, the Union has been duly designated as the collective bargaining representative of the employees in the unit described below; and

WHEREAS, the Council and the Union are parties to a collective bargaining agreement which expired on December 31, 2000, and the parties having now reached agreement on a renewal and further amendment thereof.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

### ARTICLE I. RECOGNITION

Sec. 1.    The collective bargaining unit covered by this Agreement consists of all permanent full-time teachers, assistant teachers, teacher aides; group leaders, assistant group leaders, and aides in after school programs, bookkeepers, assistant bookkeepers, assistant family day care coordinators, infant care group leader, infant care aide, cooks, assistant cooks and custodial employees employed by the Centers represented by the Council, and all permanent part-time employees in the preceding categories who regularly work fifteen (15) hours per week or more. All other employees of the Centers, including specifically directors, assistant directors, administrative assistants, substitute teachers, special project employees, executives, supervisors, guards and part-time employees regularly working less than fifteen (15) hours per week, are excluded from the unit.

Sec. 2.    Each Center recognizes the Union as the sole and exclusive collective bargaining representative of the employees in the collective bargaining unit as defined in Section 1. of this Article.    The terms "employee" and "employees" shall, except as otherwise specifically indicated, mean employees within the collective bargaining unit and no others.

Sec. 3.    Any new non-supervisory positions that are created in Day Care Programs will be covered by this collective bargaining agreement.

Sec. 4.    During the term of this Agreement a labor management committee may continue discussions concerning the creation of a Local 205 hiring hall for day care employees.

## ARTICLE II.
## UNION SECURITY/CHECK OFF

Sec. 1.   All employees in the bargaining unit who now are or who hereafter become members of the Union in good standing shall, as a condition of employment, maintain their Union membership in good standing during the term of this Agreement. All employees not now members of the Union in good standing and all new employees who are hereafter hired shall, as a condition of employment, become members of the Union in good standing thirty (30) days after the execution of this Agreement or upon completion of their probationary period, whichever is later. Tender by an employee of the initiation fee and the periodic dues uniformly required as a condition of membership in the Union shall constitute membership in the Union in good standing for the purposes of this provision. Within twenty (20) days after receipt of written notice from the Union that an employee has failed either to become a Union member or to maintain Union membership in good standing, the Center shall dismiss the employee; provided that if, during the twenty (20) day period, the employee pays or tenders the initiation, fee or dues owed, s/he shall not be discharged.

Sec. 2.   Union initiation fees and monthly dues will be deducted by each Center from the pay of employees who have authorized such deductions in writing.  The Center shall give written notice to employees upon hiring of the employee's obligation to join the Union by handing out an orientation package provided by the Union.

Sec. 3.   Centers will deduct from wages of employees a P.E.O.P.L.E. deduction provided a written authorization is signed by an employee, and provided the Union pays the cost incurred by the Center for making the deduction.

Sec. 4.   It is specifically agreed that the Employer assumes no obligation, financial or otherwise, arising out of the provisions of this Article, and the Union hereby agrees that it will indemnify and hold the Employer harmless from any claims, actions or proceedings by any Employee arising from deductions made by the Employer hereunder.   The Union further indemnifies and holds the Employer harmless from any claims, actions or proceedings by any government agency arising from deductions made by the Employer for the Political Action Fund. Once the funds are remitted to the Union, their disposition thereafter shall be the sole and exclusive obligation and responsibility of the Union.

## ARTICLE III.  WAGE RATES

Sec. 1.   All employees in the bargaining unit shall receive the following wage increases:

(a)   Effective January 1, 2005 all employees on the payroll as of the date of ratification shall receive a nine percent (9%) wage increase based upon the individual's gross salary.

(b)   Effective January 1, 2005 all employees on the payroll as of the date of the ratification shall receive a three percent (3%) wage increase based upon the individual's gross salary after the 9% wage increase has been given.

2

(c)    Effective April 1, 2005 all employees on the payroll as of that date shall receive a two percent (2%) wage increase based upon the individual's gross salary funded by the productivity savings as set forth in Section 7 below.

Sec. 2.    The minimum salary for all covered job titles shall be increased in accordance with the above wage increases.  All such increases shall be compounded.

Sec. 3.    The minimum rates of pay are set forth in the schedule of minimum rates annexed hereto.

Sec. 4.    Part-time employees shall get pro rata benefits.

Sec. 5.    Lump Sum Payment:

(a)    Effective upon ratification of this Agreement by the bargaining unit a lump sum cash payment in the amount of $1,000 shall be paid to all full-time employees who are in active pay status as of the date of ratification.

(b)    Employees who are in pay status on the date of ratification but are on approved leave without pay will receive the applicable lump sum payment upon their actual return to work.

(c)    The lump sum cash payment shall not become part of the employee's base salary rate nor be added to the employee's base salary for the calculation of any salary-based benefits including the calculation of future collective bargaining increases.

(d)    Permanent part-time employees shall receive a pro rata portion of the lump sum cash payment based upon their scheduled hours as of the date of ratification.

Sec. 6.    Any additional funding made available to the Employers to cover retroactive pay increases not otherwise covered by this Agreement shall be used to pay employees.

Sec. 7.    New Hires

The following provisions shall apply to new employees hired after April 1, 2005:

(a)    After applying the general compounded wage increase of 14.5% as set forth in Section 1 above, all newly hired employees, during the first two (2) years of employment, shall receive eleven percent (11%) less than the applicable minimum contract job rate in effect for their job title upon hiring.  Upon completion of two (2) years of employment such employees shall be paid the contractual minimum job rate for the employee's title that is in effect on the employee's two-year anniversary of their hire date.  Application for waiver of this reduction may be made to Administration for Children Services.

(b)    Employees who transfer from one New York City-funded day care program to another or are re-employed, within two (2) years from the date of last employment with the day care center, shall not be considered a "New Hire" for the purpose of Section 7.

3

Sec. 8.    (a)  All employees, other than New York State certified teachers, shall receive the following longevity differentials based upon completion of the required continuous years' service in New York City funded day care programs:

| | |
|---|---|
| 5 years of service........................................ | $138 |
| 10 years of service - an additional................ | $100 |
| 15 years of service - an additional................ | $600 |

(b)    These amounts are cumulative.  Once a longevity differential is obtained it becomes part of the employee's total base wage and is subject to compounding based upon the contractual wage increases.

(c)    Employees who become eligible for these longevity differentials shall receive such differential on January 1, or July 1, whichever is sooner after having attained the necessary years of experience.

Sec. 9.    New York State Certified teachers with Bachelor of Arts degrees shall receive the following salaries (and shall be ineligible for the Section 8(a) longevity differentials):

| | |
|---|---|
| At the beginning of the 1st Year of Teaching Service........................................... | $36,542 |
| At the beginning of the 2nd Year of Teaching Service........................................... | $37,274 |
| At the beginning of the 3rd Year of Teaching Service........................................... | $38,004 |
| At the beginning of the 4th Year of Teaching Service........................................... | $38,735 |
| At beginning of the 5th Year of Teaching Service........................................... | $39,465 |

Sec. 10.  (a)  All Certified Teachers, other than Certified Teachers with BAs,[*] shall be eligible to receive a $300 longevity differential per year for the first 4 years of teaching experience within the Center and for any related teaching experience outside the Center.

(b)    Certified Teachers[*] shall receive the following longevity differential for all years of continuous service in New York City funded day care center programs provided that the employee has been employed as a certified teacher for at least one full year prior to being eligible for the longevity increase differential:

| | |
|---|---|
| 5 years of service........................................ | $200 |
| 6 years of service - an additional.................. | $600 |

---

[*] Employees in job titles of Teacher II MA or BA with NYS Evaluation shall also receive these longevity increases.

4

| | |
|---|---|
| 10 years of service - an additional................ | $200 |
| 13 years of service - an additional................ | $500 |
| 15 years of service - an additional................ | $200 |

(c)    These amounts are cumulative.  Once a longevity differential is obtained it becomes part of the employee's total base wage and is subject to compounding based upon the contractual wage increases.

(d)    These differentials shall be paid on either January 1 or July 1, whichever is sooner, after completion of the required years of service.

Sec. 11.  (a)  In applying Sections 8 and 10, an employee shall be deemed to have fulfilled the requirement of continuous service provided the employee upon transferring from one New York City funded day care program to another does not have any employment during the interim period and the employee commences employment with the new day care center within 30 days from the date of last employment with the day care center.

(b)    Employees on leaves of absence of more than thirty (30) days shall not be given credit toward longevity increases for the time they are on such leaves.

Sec. 12.  Employees will continue to be paid bi-weekly.  The pay of an employee each payroll period shall be computed by multiplying the number of compensable days in the payroll period of 1/261 of his annual rate of pay provided, however, that the subject of the computation of gross wages shall be subject to continuing review by the parties.  The payday at each center shall be three (3) working days after the end of the payroll period, except those centers which currently have a payday more than three (3) working days after the end of their payroll period may continue the same pay lag they now have.

Sec. 13.  All cooks, assistant cooks and custodial employees shall receive an allowance for uniforms in addition to their regular pay.  This allowance shall be paid in four (4) equal installments of $29.10 on the first day in each calendar quarter of the contract year.  The uniform allowance for infant care workers, in effect on March 1, 1975, shall be continued.  The employer shall have the right to prescribe the uniform to be worn.

Sec. 14.  An assistant teacher temporarily assigned to the job of group teacher for a continuous period of more than one week shall receive a differential at the rate of $3.00 per day beginning with the second week of such period.  Beginning with the second week, assistant teachers with a B.A. shall be paid $6.00 per day.

(a)    Teacher aides assigned to a higher rated job category for a temporary period of time shall receive a differential of $3.00 per day beginning with the first full day of work in a higher category.

(b)    A non-teaching employee temporarily assigned to a higher-rated job for a continuous period of one full day or longer shall be paid for such work at the minimum rate payable in the higher-rated category.

5

Sec. 15.  (a) Newly hired teachers shall be paid at the minimum rate for their category or job title until verification of their credentials has been completed.  When verification has been completed, they shall be entitled thereafter to the applicable rate for their category or job title and shall also be paid the difference, if any, retroactive to the date of beginning of employment, subject to the provisions of Sec. 7 above.

(b)     Newly hired non-teaching employees shall be paid at the applicable hiring rate from the date of beginning employment.

Sec. 16.  (a)  Part-time employees shall be paid that proportion of the applicable contract rate for their category or job title that their scheduled weekly hours of work bear to the regular work week for their category or job title.

(b)     For all hours worked by a part-time employee in excess of his/her regular part-time schedule and up to the regular work week for his/her category or job title shall be paid at the applicable contract rate for this category or job title.

Sec. 17..  No employees other than teachers and assistant teachers shall be entitled to pay increments or differentials based upon educational attainment.

## ARTICLE IV.  HOURS OF WORK

Sec. 1.    Full-time employees are those who work no less than 35 hours per week.  Such employees shall continue to work the number of hours each week that they worked under the prior collective bargaining agreement, unless a change in the number of budgeted children or in the premises occupied by the Center alters the need for the services rendered by an employee. Full-time employees shall be paid the full contract rate for their category or job title.

Sec. 2.    Teachers shall continue to receive one-half hour daily of free time, and other employees shall continue to receive one-half hour daily for lunch.

Sec. 3.    All employees will be allowed one fifteen-minute break or rest period per day, to be taken at a time arranged in advance with the Director of the Center.

Sec. 4.    Employees who are authorized to work overtime shall be paid at the rate of one and one-half (1-1/2) times their regular hourly rate of pay.  For purposes of this section overtime shall be defined as time worked after forty (40) hours in the work week.

Sec. 5.  (a) The daily work schedule of bookkeepers shall not be changed except on at least one week's notice.  Except in case of emergency or on fee collection day (i.e., Mondays), the starting time for a bookkeeper shall be at the same hour each morning, subject to the notice of one week referred to in the preceding sentence.

(b)     The bookkeeper at a Center will be consulted in connection with the fixing of the daily work schedule of the assistant bookkeeper.

Sec. 6.    Good faith efforts will be made to rearrange schedules for employees to attend required educational courses needed for eligibility for advancement within the day care center whenever these courses are not otherwise available.

Sec. 7.    Employees shall be paid for all hours of assigned work.  Teachers will be paid for assigned work over 38 hours.  Except the two hours accumulated within the month may be used without additional compensation as in past practice.    The two hours may not be accumulated month to month.

Sec. 8.    Meetings and Staff Development Training shall generally not be conducted during employees' breaks (i.e., 1/2 hour and one fifteen minute break daily).  If meetings or training are scheduled during such breaks, employee will either be compensated for the loss of the time at their regular hourly rate or will be granted an equivalent amount of break time during that day or within the payroll period as scheduled by the director.    Meetings shall not be scheduled on holidays or weekends.

## ARTICLE V.  VACATIONS

Sec. 1.    Full-time employees shall earn vacation as follows:

a.        (i) For certified teachers, assistant teachers, teacher aides, family counselors, assistant family counselors, assistant family day care coordinators, infant care group leaders and infant care aides, at the rate of 2½ days per month for a total of thirty (30) days per year.

(ii) Employees hired after April 1, 2005 shall accrue 2½ days per month for a total of twenty-eight (28) days per year.

b.        (i) For bookkeepers and assistant bookkeepers, at the rate of two (2) days per month or a total of twenty-four (24) days per year.

(ii) Employees hired after April 1, 2005 shall accrue 1.83 days per month for a total of twenty-two (22) days per year.

c.        (i) For cooks, assistant cooks and custodial employees, at the rate of 1 3/4 days per month or a total of twenty-one (21) days per year.

(ii) Employees hired after April 1, 2005 shall accrue 1.583 days per month for a total of nineteen (19) days per year.

Sec. 2.    Vacation earned on the basis of up to two (2) years of service may be accumulated.  Any vacation accumulated in excess thereof will be converted into sick leave credits.

Sec. 3.    Employees shall submit requests for vacation in writing.  Centers shall respond in a timely manner as to whether a request is granted or denied.  Employees shall comply with the existing policy of each Center.  Any withdrawal of a prior approval of an employee's vacation must be in writing and a reason for the actions stated.

Sec. 4.    Employees shall receive vacation pay before the start of their vacations, but subject to the availability of funds (including accruals) for vacations beginning in July.  The bookkeeper at each Center shall be advised by the Center Director of each employee's scheduled

vacation at least one week before the beginning thereof. An employee who fails to return from vacation on the date scheduled for return shall receive no pay, but shall be on leave without pay, after expiration of the approved period of leave and until return to work, unless the employee establishes that the untimely return was due to emergency circumstances beyond his/her control. The preceding sentence shall not constitute or be construed as approval of any unauthorized absence, and each Center shall be free to take appropriate action regarding such absence.

Sec. 5.    Pay for earned and unused vacation shall, if the employee dies, be paid to the deceased employee's surviving spouse, child or children, parent or parents, next of kin or legal representative, in that order. Such payment by a Center to any such beneficiary shall constitute a complete discharge of the Center's obligation.

## ARTICLE VI. HOLIDAYS

Sec. 1.    The following shall constitute regular holidays with pay:

Martin Luther King's Birthday
Washington's Birthday
Memorial Day
4th of July
Labor Day
Thanksgiving Day
Friday after Thanksgiving
Day before Christmas
Christmas Day
Day before New Year's
New Year's Day

Sec. 2.    If a holiday falls on a Sunday, employees shall be given the following Monday off with pay. If Memorial Day or the 4th of July falls on a Saturday, employees shall be given the preceding Friday off with pay. If a holiday other than the two mentioned in the preceding sentence falls on a Saturday, employees shall be entitled to equivalent time off within thirty (30) days thereafter, on a date fixed by agreement between the Center and the employee.

Sec. 3.    If a holiday falls within an employee's scheduled vacation, it shall not be charged against his accrued vacation credits.

Sec. 4.    Bookkeepers, assistant bookkeepers, cooks, assistant cooks and custodial employees shall be entitled to four days off with pay per year, in lieu of a shorter summer work schedule. These days may be added to vacation time or taken at a time fixed by agreement between the Director of the Center and the employee.

## ARTICLE VII. SICK LEAVE

Sec. 1.    (a) Employees shall accumulate sick leave with pay at the rate of one (1) working day per calendar month of service or twelve (12) working days per year. Sick leave may be accumulated without limit.

8

(b) Employees hired after April 1, 2005 shall accumulate sick leave with pay at the rate of ¾ of a work day per calendar month of service or nine (9) working days per year; accumulated without limit.

Sec. 2.    Any full-time employee who reports to work and who works for two (2) hours or more but less than one-half day and then leaves because of illness will be paid his regular pay for one-half day and will be entitled to sick leave, if available, for the remainder of the day. Any full-time employee who reports for work and works more than one-half day and then leaves because of illness will be paid his regular pay for the full day without charge against sick leave.

Sec. 3.    An employee who is absent for illness for three (3) or more days must present a doctor's note to the Center. Employees who have excessive or patterned absenteeism may be required to present a doctor's note whenever they are absent due to illness.

Sec. 4.    A Center and its employees shall each comply with their rights and obligations under the Family and Medical Leave Act.

## ARTICLE VIII. EMERGENCIES, SHUTDOWNS AND RELOCATIONS

Sec. 1.    If a Center is closed because of local emergency, employees will be paid for time off up to a maximum of two (2) days' pay. If a Center continues closed for more than two (2) days because of a local emergency, the additional time off shall either be charged against the employee's vacation time or shall be taken as leave without pay at the option of the employee. A Center that is to be shut down because the premises are to be painted or renovated shall give notice thereof to its employees at least four (4) weeks in advance of the shut-down for that purpose; if such notice is given, any time off from work during the period of shut-down that employees are required to take shall be charged against their vacation time or shall be taken as unpaid leave, at the option of each employee.

Sec. 2.    If a Center is shut down during an emergency declared to be such by the Mayor of the City of New York, the time shall not be charged against their vacation time. If a Center stays open and operates during such an emergency, those of its employees who work during the emergency are to receive equivalent time off. (This provision is intended to follow the terms of the memorandum issued by the New York City Department of Social Services under date of March 27, 1967.)

Sec. 3.    In case of a personal emergency, an employee shall be granted up to three (3) days of emergency leave per year, such leave to be charged against vacation time. To receive emergency leave, an employee must give reasonable advance notice to the Center, unless prevented from doing so by causes beyond his/her control.

Sec. 4.    In the event that a Center whose employees are in the bargaining unit is shut down, a list of the names of the employees whose employment is terminated as a result thereof, shall be furnished by the Center to the Union; provided, however, that this shall in no sense create or connote any right to "bump."

Sec. 5.    In the event of a permanent shut-down or relocation of a center, the Employer shall give the Union six (6) weeks notice.  In the event the City gives the Center less than six weeks notice, the Employer shall give as much notice as possible.

Sec. 6.    Six months before a Center's lease ends, the Center will establish a search committee in the event a relocation is necessary.  The committee shall include at least one (1) Union member, to locate alternative space to house the Center.

Sec. 7.    A grievance concerning the shut-down or relocation of a Center shall be initiated at step 3 of the grievance procedure.

## ARTICLE IX.  JURY DUTY

Employees called to serve as jurors shall continue to turn in to their Centers the checks they receive in payment for their services as jurors.  They are to receive their full pay at regular rates for the time spent in jury service, plus whatever amount they were paid as jurors by way of transportation allowances.  Employees relieved from jury service during any work day on which they are called to serve shall promptly report to work at their centers.

## ARTICLE X.  LEAVES OF ABSENCE

Sec. 1.    *Maternity or Paternity Leave:*

Maternity or paternity leave without pay will be granted for up to eighteen (18) months.  Upon return from maternity or paternity leave, the employee shall be entitled to return to his/her old job, but without service or seniority credit for the period of the leave.

Sec. 2.    *Sabbatical Leave:* Teachers with five (5) years or more of continuous service with any one day care Center shall be eligible for a sabbatical leave without pay.  Such leave shall be granted on not less than six (6) months' advance notice and application by the teacher and shall be granted only if it is to be devoted to an educational program, that, in the judgment of the Center, fits into the policies and program of the Center.  There shall not be more than one teacher on sabbatical leave at any time if the Center has ten or fewer teachers and not more than two teachers on sabbatical leave at any time if the Center has more than ten teachers.  The period of sabbatical leave shall be fixed by mutual agreement between the Center and the teacher and shall be based on the educational program the teacher contemplates for the period of leave.

Sec. 3.    In the event of death in an employee's immediate family, the employee will be given time off with pay, as follows: four (4) days off upon death of a parent, spouse, domestic partner or child; and two (2) days off upon death of a brother, sister, or grandparents.  In the event that New York City changes its rules regarding domestic partner benefits, the Employer agrees to consider and discuss reopening this section of the agreement.  Domestic partners shall be defined in accordance with New York City regulations.

Sec. 4.    Leave without pay may be granted at the discretion of the Center, but leave without pay may not be granted until earned vacation has been used up.  Vacation credits do not accrue during leave without pay.

## ARTICLE XI.
## HEALTH, SAFETY AND WELFARE

Sec. 1.    The Center will pay for the cost of individual or family coverage (non-extended), as appropriate, under Blue Cross (Associated Hospital Service of New York), plus either Group Health Insurance or Health Insurance Plan-Health Maintenance Organization coverage at the option of the employee.  An employee who is on authorized extended leave without pay as provided in this Agreement shall have the option of continuing coverage under Blue Cross plus GHI or HIP at his/her own expense if such continued coverage is permitted by the carrier.

Sec. 2.    The Day Care Council - Local 205, District Council 1707 Welfare Plan, established by trust agreement dated April 24, 1970, shall be continued in effect, and contributions shall be made by the Centers to the Plan at the rate of $1,090 per full-time equivalent employee per year.  Effective January 1, 2005 each Center's contribution shall be increased by .16 percent (.16%) of employees' gross wages.

Sec. 3.    Coverage under the New York State Disability Benefits Law shall be continued for all employees.  The Centers shall continue to make the deductions from employees' salaries authorized by the provisions of the New York State Disability Benefits Law.  Upon receipt by a Center of disability benefits payments from any insurance carrier pursuant to the Disability Benefits Law for any period of time for which the Center is obligated to pay an employee sick leave under this Agreement, the employee shall be credited with and the Center shall be obligated to grant additional sick leave equal to two-thirds of the amount of the benefits payments received by the Center, which additional sick leave shall be computed and made available promptly upon exhaustion by the employee of the sick leave to which s/he was entitled at the time that his/her absence because of illness began.  The additional sick leave time shall be computed on the basis of the employee's rate of pay.

Sec. 4.    (a)    A joint Health and Safety Committee shall be established by the parties, composed of equal representatives of the Employer and the Union.  The Committee shall meet as necessary to discuss and consider appropriate means of resolving health and safety issues.

(b)    Any experts the Union may designate, shall have access to all work places for the purpose of investigating and assessing allegedly hazardous working conditions.  Such visit shall be made upon reasonable notice to the Employer and in a manner that minimizes disruption to the school or other workplaces.

Sec. 5.    (a)    The Employer will comply with all federal, state and local health and safety laws.

(b)    The Employer will post all health and safety notices required by law.

Sec. 6.    Employers will notify employees and the Union about all asbestos reports, plans and proceeds of which they have knowledge and will provide access to such documents.

11

# ARTICLE XII.
## TERMINATION AND RESIGNATION

Sec. 1.    Discharge of an employee shall be for just cause.    An employee whose employment is to be terminated (except where the circumstances warrant summary dismissal or where operation of a Center is discontinued permanently or for an indefinite period because of some emergency) shall receive written notice thereof, stating the grounds therefor, as follows: for teachers, four weeks' notice in advance of the effective date of termination; for other employees, two weeks' notice in advance of the effective date of termination. A copy of such notice shall be given to the Union Steward.

Sec. 2.    An employee may not be suspended without pay for more than thirty (30) calendar days pending an investigation of alleged employee misconduct.

Sec. 3.    An employee who resigns shall give written notice of resignation to the Director of his/her Center four (4) weeks in advance of the effective date of the resignation in the case of teachers and two (2) weeks in advance of the effective date of the resignation in the case of other employees. If an employee fails to give the required timely written notice of resignation to the Director of his Center, the Center has the right to submit the matter directly to arbitration and the arbitrator shall have the power to impose an appropriate penalty. However, if a member of the teaching staff fails to give the required advance written notice of resignation, the employee will forfeit accrued unpaid vacation pay in an amount equal to the number of days by which the advance written notice falls short of the required four weeks' notice.

## ARTICLE XIII. UNION ACTIVITY

Sec. 1.    There shall be no strike, stoppage, slow-down, picketing or other interference of any kind with the work of the Centers by the Union or by the employees covered by this Agreement. There shall be no lockout by the Centers of any of the employees covered by this Agreement.

Sec. 2.    There shall be no union activity, including distribution of Union literature by employees or by Union representatives, during working time. Union material shall be posted on a separate bulletin board to be provided and designated by the Center.

Sec. 3.    A Union representative shall have the right to enter the Center's premises for the purpose of administering this Agreement. Advance notice shall be given the Center of any such proposed visit. These visits shall not interfere with the performance by employees of their duties. A place for discussion of grievances or other Union business, if available on the premises, shall be provided by the Center.

Sec. 4.    Upon request by the Union, up to five (5) employees in the entire bargaining unit shall be granted leaves of absence without pay for the purpose of attending to Union business for a period of up to one year. Such leave shall be renewable for one additional year.

Sec. 5.    There shall be no discrimination for lawful Union activity.

Sec. 6.    All mail addressed to the shop steward from the Union shall be forwarded to the steward promptly and unopened.

## ARTICLE XIV.
## SUBSTITUTES, TRAINEES AND
## TEMPORARY EMPLOYEES

Sec. 1.    Substitutes and trainees shall not be used by any Center for the purpose of displacing qualified permanent employees.

Sec. 2.    When substitute or "extra" work is available at a Center, the assignment shall be offered in order of seniority to qualified, permanent, part-time employees.    Part-time employees may work more than one (1) "time slot," up to the full-time daily schedule for the position, provided that such assignment shall be determined by the Director.  The determination of the Director will be subject to the grievance procedure and arbitration, but only on the issue of whether the Director's determination was arbitrary and capricious.

Sec. 3.    Temporary employees replacing regular employees on unpaid leave for four (4) months or more will be covered under the collective bargaining agreement for purposes of welfare, health benefits and salary at the beginning of the fourth month.  In the event that such temps are hired as regular employees their temporary service shall be credited toward the probationary period and the health and welfare waiting period.

## ARTICLE XV.
## GRIEVANCE AND ARBITRATION

Sec. 1.    A grievance is a dispute between the Union and the Center as to the interpretation or application of any of the terms of this Agreement or the asserted breach thereof, including the discharge of any employee.  A grievance must be initially presented within thirty (30) days after the facts giving rise to the grievance were discovered or should have been discovered.

Sec. 2.    Grievances shall be handled in accordance with the following procedure:

Step 1.    An employee with a grievance may, alone or together with his/her Union representative, first discuss it with a representative of the Center designated by the Board.  If the grievance is informally resolved, no record thereof shall be made or kept without the written consent of the grievant.

Step 2.    If it is not resolved, the grievance shall then be submitted in writing by the grievant and a Union representative to the employee's Center Director within ten (10) working days from completion of Step 1.  The Director shall give his/her written decision thereon within ten (10) days after receipt of the written grievance.

Step 3.    A grievance not resolved in Step 2 may, within thirty (30) calendar days after completion of Step 2, be submitted in writing by the Union to the Board of Directors of the Center, which shall give its written decision thereon within ten (10) working days after receipt of the written grievance.

Step 4. A grievance not resolved in Step 3 may, within thirty (30) calendar days after completion of Step 3, be submitted in writing by the Union or the Center to the Director of the Day Care Council's Labor Relations Assistance and Mediation Service for mediation. In the event the matter is not resolved via mediation efforts, the Director of the Labor Relations Assistance and Mediation Service shall notify both parties in writing that mediation efforts have been completed.

Step 5. A grievance not resolved in Step 4 may be submitted to arbitration to the American Arbitration Association in the City of New York under its then obtaining Voluntary Labor Arbitration Rules, unless the grievance involves a dispute which is not subject to arbitration under the terms of this Agreement. The fee and expenses of the arbitrator and the charges of the American Arbitration Association shall be borne equally by the parties. The award of the arbitrator shall be final and binding, except for proceedings to enforce or vacate the award as permitted by law.

Sec. 3. Request for arbitration must be made by the party desiring it within thirty (30) calendar days after completion of Step 4, and shall be made in writing to the other party and to the American Arbitration Association specifying the issue or issues to be arbitrated. A grievance not submitted at any step of the grievance procedure or not submitted to arbitration in due time shall be deemed settled on the basis of the decision last given, if any, and further prosecution thereof shall in any event be barred. If a decision on a grievance is not given in due time, the grievance may be taken to the next step. After submission of a grievance to arbitration, the Center and the Union are encouraged to continue to seek to resolve the grievance. The time limit fixed for submission of the grievance to arbitration shall not be extended by any mediation efforts or discussions which may occur after completion of Step 4.

Sec. 4. The Union, as such, and any Center shall have the right to submit grievances. Any such grievances may be initiated at Step 2, and shall then be processed in accordance with the procedure set forth herein. The Union and/or Center may, in emergency circumstances, file immediately for Step 4 mediation after initial presentation of a written grievance.

Sec. 5. In connection with any grievance that has reached Step 2, a meeting shall be held at the request of either party hereto between the Board of Directors of the Center involved, or a committee or designee thereof, and the grievant and a representative of the Union and/or the appropriate grievance committee, for the purpose of discussing the grievance before a decision is made.

Sec. 6. No grievance settlement or arbitration award shall be retroactively effective to a date preceding the date on which the cause of the grievance first occurred or arose or to a date more than thirty (30) calendar days before the first written submission of the grievance, whichever is later.

Sec. 7. A Union representative, the grievant and up to two witnesses shall, if in the employ of the Center, be granted necessary time off with pay for the purpose of handling grievances. A grievant shall be granted time off with pay to attend a Step 5 hearing (arbitration hearing) if the grievant is still in the employ of the Center at the time of the hearing.

Sec. 8.   If an employee is terminated or suspended without pay indefinitely, due to an allegation of child abuse, the Union may immediately grieve and arbitrate the disciplinary action in accordance with the grievance and arbitration provision of the collective bargaining agreement.

Sec. 9.   Any contractual grievance arising out of the shutdown or relocation of a center shall be initiated at Step 3.   Mediation shall be held and a decision tendered as soon as practicable.  But if mediation is not held within five (5) working days, the Union has the option of referring the grievance to arbitration.

Sec. 10.   Any question concerning the interpretation of the collective bargaining agreement must be referred to the Day Care Council within the time period referred to in Sec. 1, above.

Sec. 11.   The Union shall not file grievances or arbitrations against the Day Care Council of New York, Inc. as the Day Care Council is not a Center or an employer of the employees under the terms of this Agreement.  Therefore, the Day Care Council of N.Y., Inc. assumes no legal liability for the actions of its member day care centers nor for their violations of the collective bargaining agreement.  The Day Care Council of N.Y., Inc. acts as an agent for and on behalf of its members.

## ARTICLE XVI.  SAVINGS CLAUSE

Except as modified by or inconsistent with the terms of this Agreement, the present terms and conditions of employment of the employees covered by this Agreement shall be continued in effect as if made part of this Agreement.

## ARTICLE XVII.  MANAGEMENT RIGHTS

Each Center shall have the right to determine its program and policies in accordance with policies established by the Agency for Child Development — A.C.S. for reimbursement to Day Care agencies, and to retrench and reorganize its activities and staff at its discretion, and such decisions are not to be subject to the grievance procedure or to arbitration.  Subject to the terms of this Agreement, each Center shall also have the right to promulgate working rules and procedures; to hire, lay off, promote, assign duties to, transfer, discipline or dismiss employees; to carry out the customary functions of management; and to determine the extent and scope of each job and to make and change work assignments.

## ARTICLE XVIII.  SENIORITY

Sec. 1.   Seniority is the length of an employee's continuous service in a single category or job title at one Center since the most recent date of hire; provided, however, that such service by an employee in the categories or job titles of teacher aide, assistant teacher and certified teacher, or assistant bookkeeper and bookkeeper, or family counselor and assistant family counselor, or assistant cook, cook, and custodian shall be added together to determine the employee's length of service.

Sec. 2.    Layoffs shall be made in order of seniority, and recall from layoff shall be in inverse order of layoff, provided that the employee to be retained in case of layoff or the employee to be recalled from layoff must be capable of doing the work available.

Sec. 3.    Seniority, qualifications and the ability to perform the job shall be considered in making promotions to jobs within the bargaining unit.  Job openings within a Center shall be posted for five (5) working days on bulletin boards in that Center to give interested employees an opportunity to apply.

Sec. 4.    In the fixing of vacation schedules and the granting of leaves, preference shall be given on the basis of seniority, subject to the operational needs of the center.

Sec. 5.    An employee holding a part-time job at a Center shall be given preference over any non-employee for the purpose of filling a vacancy in a regular full-time job at the Center if the incumbent is qualified and has the ability to perform the job.

Sec. 6.    Top seniority shall be given to one shop steward at each Center for the purpose of determining the order of layoffs.

Sec. 7.    Seniority shall continue to accumulate during vacations, authorized periods of paid sick leave, and other leaves with pay.  Seniority shall not accumulate, but shall be retained, during periods of leave without pay permitted under this Agreement, up to a maximum of eighteen (18) months.

Sec. 8.    An employee's seniority shall terminate for any of the following reasons:

a.    Discharge for cause.

b.    Layoff for a period of more than two (2) years, provided that after the first year, the employee notifies his/her Center every four (4) months as to whether he/she remains available for recall.  Failure to so notify the Center shall extinguish the employee's recall rights.

c.    Failure to report to work without notice to the Employer for five (5) days, except for good cause shown.

d.    Absence without pay because of illness for two (2) years.

e.    Failure to return from layoff within five (5) working days after written notice of recall has been mailed to the last known address of the employee, except for good cause shown.

f.    Voluntary resignation.

Sec. 9.    Employees shall have the right to be recalled to their former job classification for one (1) year or the length of their employment, whichever is less, to the Center from which they were laid off.

16

Sec. 10. The Day Care Council will publish a monthly list of laid off employees and their job titles. The Union will be provided with the Day Care Job Opportunity Bulletin so that laid off employees can call the Union to receive such information.

## ARTICLE XIX. JOINT LABOR MANAGEMENT COMMITTEE ON PRODUCTIVITY GAINS AND NEW FUNDING

Sec. 1. Up to an additional one percent (1%) of gross payroll shall be made available subject to identification of funding by the Committee. The Committee, which shall be composed of five (5) representatives each from the Union and the Council, shall work to identify and apply measurable savings to be used to fund additional employee compensation by the development of initiatives to generate workplace savings, maximize the potential of the workforce, and ensure the provision of day care services. The unanimous recommendations of the Committee shall be presented to representatives of the City to determine the amount of savings generated by the recommendation. The Committee will also seek to identify new sources of funding. This money will then be made available to the parties to apply to pay parity with the Department of Education for certified teachers, increased benefit fund contributions or other contractual benefits.

## ARTICLE XX. MISCELLANEOUS

Sec. 1. The Employer shall have the right to create new jobs, to fill them, to classify them and to fix the rates of pay therefor. If the Union objects, it may submit the issue to the grievance machinery, including arbitration.

Sec. 2. A joint committee consisting of an equal number of members designated by the Employer and the Union shall formulate job descriptions for all categories or job titles covered by this Agreement. Copies of job descriptions shall be made available for distribution to covered employees. The job descriptions thus prepared shall be subject to revision thereafter as and when made necessary by changes in job functions.

Sec. 3. The probationary period for all employees shall be three (3) months. Bookkeepers will be consulted in connection with the evaluation of probationary assistant bookkeepers, but their opinion shall be only advisory. The probationary period for any probationary employee may be extended for an additional period up to the length of the initial period, by mutual agreement between the Center, the employee and the Union.

Sec. 4. The Employer will furnish to the Union a roster of the employees in the bargaining unit containing the name, job title, date of employment, social security number, current rate of pay and scheduled work week of each employee. During the term of this Agreement, the Employer will monthly provide the Union with a list of the names of employees added to or removed from the bargaining unit together with the information mentioned in the preceding sentence for each new employee.

Sec. 5. Amounts payable by an employee to the CSAE Federal Credit Union will be deducted by the Employer from the pay of the employee if appropriate written authorization to make such deductions is received from the employee. Amounts so deducted shall be promptly remitted to the CSAE Federal Credit Union.

Sec. 6.    A joint committee consisting of an equal number of members designated by the Employer and the Union shall consider a career ladder program applicable to employees covered by this Agreement. The committee shall act only on the basis of unanimous agreement. Neither its conclusions, nor a failure to reach conclusions, nor any of the issues considered by it shall be subject to the grievance procedure or to arbitration.

Sec. 7.    The Council shall provide the Union with a copy of any communication from it to its constituent Day Care Centers relating to the terms and conditions of employment of employees in the bargaining unit.

Sec. 8.    The Council will promptly notify the Union of any training program for bargaining unit employees which comes to the attention to the Council.

Sec. 9.    The parties shall form a committee consisting of an equal number of representatives from the Union and the Council to discuss the procedure for implementation of Head Start/Day Care collaboration, and to consider and discuss implantation of Universal Pre-K within the group day care setting. Within 10 days of the ratification of this Agreement the parties shall agree to a date for the first committee meeting.

Sec. 10.    An employee may, upon advanced, written application to his/her Center Director, review his/her personnel file which shall be available during normal office hours on non-working time. An employee may authorize, in writing, a shop steward to review his/her personnel file. This shall be limited to three times a year and when a grievance has been filed.

Sec. 11.    In accordance with state law, employees shall be given reasonable time to cash their payroll checks. A labor management committee shall be established to explore solutions to the banking issue.

Sec. 12.    Upon request by the Employee, the Employer will request that ACD extend the time for completion of a study plan, if there has been an employee illness which prevents the employee from finishing the study plan as scheduled. The parties agree that ACD's decision shall be final and binding. All teachers must receive NYS certification within five (5) years of their commencement of employment.

Sec. 13.    WEP workers shall not replace incumbent employees at a Center.

## ARTICLE XXI. NON-DISCRIMINATION

Sec. 1.    The Centers and the Union agree not to discriminate against any individual with respect to his/her hiring, compensation, terms or conditions of employment because of such individual's race, color, creed, age, gender, marital status, citizenship status, sexual orientation, national origin, or disability, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of his/her race, color, creed, age, gender, marital status, citizenship status, sexual orientation, national origin, or disability. The parties to this Agreement further recognize, however, the primary jurisdiction of the various state and federal regulatory agencies insofar as claims of unlawful discrimination are concerned. In light of the foregoing, no "grievance" or "arbitration" as provided for elsewhere in this Agreement shall be permitted in instances of discrimination claims.

Sec. 2.    The Centers and the Union agree that there will be no discrimination by the Centers or the Union against any employee because of his or her membership in the Union or because of any employee's lawful activity and/or support of the Union.

## ARTICLE XXII.
## DURATION OF AGREEMENT

This agreement shall be in effect for the period from January 1, 2001 to and including March 31, 2006. Should either party desire to terminate this Agreement or to make any changes to become effective after the date of expiration, it shall notify the other in writing of its desire to terminate or of the proposed changes not less than ninety (90) days prior to the date of expiration. The parties shall thereupon meet and negotiate with regard to any changes proposed. Upon notification by either party of its desire to terminate or make changes after the date of expiration, the Agreement shall continue in full force and effect during the negotiations for a successor agreement, except that either party may terminate the continuation of the Agreement upon twenty (20) days' written notice to the other party.

IN WITNESS WHEREOF, the parties hereto, by their duly authorized officers and representatives, have executed this Agreement the 11th day of February, 2005.

DAY CARE COUNCIL OF NEW YORK, INC.

By  /s/ _____
       President

By  /s/ _____
       Executive Director

LOCAL 205, DISTRICT COUNCIL 1707
CSAEU, A.F.S.C.M.E., AFL-CIO

By  /s/ _____
       President, Local 205

DISTRICT COUNCIL 1707, COMMUNITY
AND SOCIAL AGENCY EMPLOYEES
UNION, A.F.S.C.M.E., AFL-CIO

By  /s/ _____
       Executive Director

LOCAL 205, DISTRICT COUNCIL 1707
CSAEU, A.F.S.C.M.E., AFL-CIO

By  /s/ _____
       Director of Administration

19

**APPENDIX I**
**SCHEDULE OF MINIMUM RATES**

| JOB TITLE | Through December 31, 2004 Annual Salary | Effective January 1, 2005 Annual Salary | Effective January 1, 2005 Annual Salary | Effective April 1, 2005 Annual Salary |
|---|---|---|---|---|
| Teacher (Certified, with a Master's degree in Education) | $34,362 | $37,455 | $38,578 | $39,350 |
| Teacher II (MA with NYS Evaluation) | $33,506 | $36,522 | $37,617 | $38,370 |
| Teacher (Certified, with student teaching Credit) | $32,142 | $35,035 | $36,086 | $36,808 |
| Teacher (Certified, with BA) | $31,910 | $34,782 | $35,825 | $36,542 |
| At the beginning of 2nd year of service | $32,549 | $35,478 | $36,543 | $37,274 |
| At the beginning of 3rd year of service | $33,187 | $36,174 | $37,259 | $38,004 |
| At the beginning of 4th year of service | $33,825 | $36,869 | $37,975 | $38,735 |
| At the beginning of 5th year of service | $34,463 | $37,565 | $38,692 | $39,465 |
| Teacher II (BA with NYS Evaluation) | $31,610 | $34,455 | $35,489 | $36,198 |
| Teacher (Uncertified, with BA or BS - Study Plan Teacher III) | $25,819 | $28,143 | $28,987 | $29,567 |
| Teacher (Uncertified, with Study Plan - Study Plan Teacher II - 90 credits) | $24,918 | $27,161 | $27,975 | $28,535 |
| Teacher (Uncertified, with 60 credits, including 24 credits in Education - Study Plan Teacher I - AA Degree in Early Childhood Education) | $24,113 | $26,283 | $27,072 | $27,613 |
| Assistant Teacher (with BA or BS) | $23,740 | $25,877 | $26,653 | $27,186 |
| Assistant Teacher (with 60 credits, including 24 credits in Education) | $23,072 | $25,148 | $25,903 | $26,421 |
| Assistant Teacher (with 60 credits) | $22,616 | $24,651 | $25,391 | $25,899 |
| Assistant Teacher (with 30 credits) | $21,819 | $23,783 | $24,496 | $24,986 |
| Assistant Teacher (with High School Diploma) | $21,136 | $23,038 | $23,729 | $24,204 |
| Teacher Aide | $20,221 | $22,041 | $22,702 | $23,156 |
| Infant Care Aide | $20,221 | $22,041 | $22,702 | $23,156 |
| Infant Care Group Teacher | $22,708 | $24,752 | $25,494 | $26,004 |
| Group Leader II (Certified teacher with Masters Degree In Education) | $34,362 | $37,455 | $38,578 | $39,350 |
| Group Leader II (M.A. in Education - NYS Evaluation, Credential Shown on or after 4/1/95) | $33,506 | $36,522 | $37,617 | $38,370 |
| Group Leader II (Certified Teacher with BA) | $31,910 | $34,782 | $35,825 | $36,542 |
| At beginning of 2nd year of service | $32,549 | $35,478 | $36,543 | $37,274 |
| At beginning of 3rd year of service | $33,187 | $36,174 | $37,259 | $38,004 |
| At beginning of 4th year of service | $33,825 | $36,869 | $37,975 | $38,735 |
| At beginning of 5th year of service | $34,463 | $37,565 | $38,692 | $39,465 |

20

**APPENDIX I**
**SCHEDULE OF MINIMUM RATES**

| JOB TITLE | Through December 31, 2004 | Effective January 1, 2005 | Effective January 1, 2005 | Effective April 1, 2005 |
|---|---|---|---|---|
| | Annual Salary | Annual Salary | Annual Salary | Annual Salary |
| Group Leader II (B.A. in Education – NYS Evaluation Credential Shown on or after 4/1/95 | $31,610 | $34,455 | $35,489 | $36,198 |
| Group Leader I (Uncertified Teacher with Bachelor s Degree) | $25,819 | $28,143 | $28,987 | $29,567 |
| Group Leader I (With Associates Degree) | $23,564 | $25,685 | $26,455 | $26,984 |
| Group Leader I (High School Diploma + 3 years of relevant professional experience) | $22,084 | $24,072 | $24,794 | $25,290 |
| Assistant Group Leader (With Bachelor's Degree+) | $23,740 | $25,877 | $26,653 | $27,186 |
| Assistant Group Leader (With 60 College Credits) | $22,616 | $24,651 | $25,391 | $25,899 |
| Assistant Group Leader (With 45 college credits or 30 college credits + 6 months of experience) | $21,819 | $23,783 | $24,496 | $24,986 |
| Assistant Group Leader (with High School Diploma + 1 year of experience) | $21,136 | $23,038 | $23,729 | $24,204 |
| Assistant Family Day Care Coordinator | $24,330 | $26,520 | $27,315 | $27,862 |
| Bookkeeper II (2 years outside experience) | $25,706 | $28,020 | $28,860 | $29,437 |
| Bookkeeper II (1 year outside experience) | $25,264 | $27,538 | $28,364 | $28,931 |
| Bookkeeper II | $24,819 | $27,053 | $27,864 | $28,422 |
| Bookkeeper | $23,073 | $25,150 | $25,904 | $26,422 |
| Assistant Bookkeeper | $21,054 | $22,949 | $23,637 | $24,110 |
| Cook (with specialized food handling course) | $20,912 | $22,794 | $23,478 | $23,947 |
| Cook (without specialized handling course, incumbent as of 09/09/88) | $20,757 | $22,625 | $23,304 | $23,770 |
| Assistant Cook | $20,375 | $22,209 | $22,875 | $23,333 |
| Maintenance Worker | $20,912 | $22,794 | $23,478 | $23,947 |
| Custodial Employee (Janitor) | $20,545 | $23,394 | $23,066 | $23,527 |

# EXHIBIT

# 2

AMERICAN ARBITRATION ASSOCIATION
LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration Between

HIGHBRIDGE ADVISORY COUNCIL FAMILY SERVICES, INC.

and

LOCAL 205, COMMUNITY AND SOCIAL AGENCY EMPLOYEES UNION,

DISTRICT COUNCIL 1707, A.F.S.C.M.E.

AAA Case No. 13 300 02551 06

## AWARD OF ARBITRATOR

The undersigned Arbitrator, having been designated in accordance
with the arbitration agreement entered into by the above-named parties,
and having been duly sworn, and having duly heard the proofs and
allegations of the parties, AWARDS as follows:

Based on the evidence submitted, Highbridge Advisory Council

Family Services, Inc., the Employer, shall pay forthwith to Grievant

Margaret Murray the amount of $49,407.46; to Grievant Vivian Byrd the

sum of $3094.83, reflecting an offset for unemployment benefits received;

to Grievant Adrian Jones the amount of $5126.23, reflecting an offset for

unemployment benefits received; and to Grievant Tyrone Sylvester the

amount of $12,571.00, less an offset for any unemployment benefits he may have received during the interval of his suspension. If Grievant Sylvester does not submit documentary evidence through the Union to the Arbitrator within twenty days after the effective date of this Award, a deduction of $5,538, representing twenty-six weeks at $213 per week unemployment benefits, shall be inferred as an offset.

The Arbitrator hereby retains jurisdiction for the purpose of resolving any dispute that may arise regarding the computation or implementation of the remedies ordered pursuant to this Award.

Daniel F. Brent, Arbitrator

November 16, 2007

State of New Jersey
County of Mercer

On this 16th day of November, 2007 before me personally came
and appeared Daniel F. Brent, to me known and known to me to be the
individual described in the foregoing instrument, and he acknowledged
to me that he executed the same.

_____
An Attorney at Law of the
State of New Jersey

AMERICAN ARBITRATION ASSOCIATION
LABOR ARBITRATION TRIBUNAL

---

In the Matter of the Arbitration Between


HIGHBRIDGE ADVISORY COUNCIL FAMILY SERVICES, INC.

and

LOCAL 205, COMMUNITY AND SOCIAL AGENCY EMPLOYEES UNION,

DISTRICT COUNCIL 1707, A.F.S.C.M.E.


AAA Case No. 13 300 02551 06

---

A hearing was held in the above-entitled matter on

October 19, 2007 at the American Arbitration Association in New York

City before Daniel F. Brent, duly designated as Arbitrator. Both parties

were advised of the time, date, and place of this hearing, and Counsel for

the Employer and for the Union participated in a conference call with the

Arbitrator shortly before the hearing regarding the scheduling of the

hearing and attendance at the hearing. Counsel for the Employer

advised the Arbitrator and Counsel for the Union during this conference

2

call that the Employer would not appear at the hearing, whereupon the Arbitrator granted the Union's Motion to proceed <u>ex parte</u>.

At the arbitration hearing, the Union submitted sworn testimony and documentary evidence in support of its position.  The Arbitrator considered these proofs in reaching his decision in the instant matter.

By agreement of the parties, the Arbitrator undertook to provide both parties with a draft Award and Opinion in order to afford the Employer an opportunity to protest any factual inaccuracies in the evidentiary record.  A draft opinion was sent to both parties on October 26, 2007.  The Employer provided a written submission dated November 9, 2007, to which the Union replied on November 9, 2007.  The record was declared closed on November 9, 2007.

<u>APPEARANCES</u>

<u>For the Union:</u>

Thomas M. Murray, Esq., of Kennedy, Jennik, and Murray, Esqs.

Anthony Rios, Union Representative

3

## ISSUE SUBMITTED

What payments, if any, are due and owing by the Employer to Grievants Tyrone Sylvester, Vivian Byrd, and Adrian Jones arising from their suspension from their employment on or about December 5, 2005 and reinstatement and arising from the suspension of Grievant Margaret Murray on August 20, 2005?

## NATURE OF THE CASE

The grievants were employed as Group Teachers in the day care center and after school program operated by the Employer, Highbridge Advisory Council, which is located in the Bronx.  On August 19, 2005, an incident occurred on the roof play area of the Highbridge facility in which a child was injured by the rope used during a game of tug of war.  The Employer reported this incident to the New York State Office of Children and Family Services.  As a result of the Employer's reporting this incident, a report was made by the New York State Office of Children and Family Services to the New York State Child Abuse and Maltreatment Register (SCR) in which the grievants were "named as a subject".  No formal action was taken against any of the grievants in connection with this incident.

4

The grievants subsequently filed requests for amendment of the record on file in New York State Child Abuse and Maltreatment Register. As a result of these appeals, an administrative review was initiated by the State. Ultimately, by decision of an Administrative Law Judge, the record reports maintained in the Central Register were amended to reflect that the appellants were no longer identified as a subject of the report. The Central Register and the New York City Administration for Children's Services and the County Department for Social Services were directed to amend their records accordingly.

A decision was rendered regarding Grievant Margaret Murray on September 25, 2006. A decision was rendered regarding Grievants Vivian Byrd, Adrian Jones and Tyrone Sylvester, as well as another grievant, Linda Fergerson, on August 7, 2006. As a result of these decisions, Grievants Tyrone Sylvester, Vivian Byrd, and Adrian Jones were reinstated to their former positions for a brief interval until the funding of their program was discontinued by the City of New York. Grievant Murray was not reinstated.

The instant grievance was filed when the Employer refused to reimburse the grievants for back pay and benefits they had lost during the period of their suspensions. According to the Union, the grievants

5

were improperly and arbitrarily deprived of employment during this interval and were effectively precluded from obtaining substitute interim employment in their field or in any related field while their names were listed on the Central Register of Child Abuse and Maltreatment by the State of New York.

The Employer denied the grievance, contending that it had expended all of the monies provided for operating the grievants' programs by the City of New York, which funds all of the activities for which the grievants are employed, in paying other employees to perform the grievants' duties during their suspensions. The Employer further contended that, as no additional funds were available to reimburse the grievants for the losses they had suffered in connection with their suspensions, the Employer had no further duty to pay the grievants for their losses.

The parties were unable to resolve their dispute within the grievance procedure, and the matter was brought to arbitration.

6

## DISCUSSION AND ANALYSIS

### I. Re: Group Teacher Margaret Murray

Margaret Murray was employed by Highbridge as a Group Teacher. Ms. Murray was suspended on August 20, 2005 following an incident on August 19, 2005. and never was reinstated.  She was, however, subsequently hired by the New York City Department of Education in June, 2007.  According to the Union, Ms. Murray was improperly deprived of income by virtue of her suspension because Ms. Murray had been offered a position as a full-time ACD Assistant Teacher at the Highbridge Advisory Council Family Services Facility commencing July 25, 2005 (Union Exhibit 5).  The letter acknowledges that the grievant has accepted the position, and welcomes the grievant.  Union Exhibit 5 states:

> This is a full-time position paid bi-weekly.  Your bi-weekly salary will be $1,041.61. Your benefits will be continued in the new position; however, your accrued sick and vacation days will be converted into full-time equivalencies as follows:  vacation accrual 21, sick accrual 11.  Your official start date is July 25, 2005.

A hearing was held pursuant to Section 422 of the New York State Social Services Law, before Administrative Law Judge Paul S. McDonough.  In a decision in Fair Hearing No. 41561, Judge McDonough found the following facts:

7

The Appellant was a group leader teacher for five or six year old children at a day care center. On the day in question, 8/19/2005, the Center had planned a cook out in a park which had been moved to the roof of the Center due to inclement weather. The appellant was assisted in caring for the children by an assistant, Marianel Acosta. In addition to the appellant's group, there were three additional groups of progressively older children, each group containing approximately twenty children. The children engaged in various activities, one of which was a tug-of-war. In the course of the tug-of-war, the rope somehow became twisted around the neck of one of the appellant's charges, resulting in injuries to him. Upon completing their investigation, the report was indicated by the Agency against the appellant for child abuse and maltreatment.

In his decision, Judge McDonough stated the issues to be:

Is the report of child abuse and maltreatment by the appellant supported by a fair preponderance of evidence? If such acts are established, are such acts currently relevant and reasonably related to employment in child care or to the provision of foster or adoptive care by the appellant?

Judge McDonough then held that:

The Agency [ i.e., the City's Agency, not the Employer Highbridge] did not prove by a fair preponderance of evidence that the appellant committed the abuse and maltreatment alleged. As the report will be amended to reflect that the appellant is no longer identified as a subject of the reports, the question of whether the abuse and maltreatment alleged is relevant and reasonably related to child care issues need not be addressed.

Following a lengthy discussion in which the Judge further reviewed the incident and the proofs, Judge McDonough held that:

Maltreatment not having been established by a fair preponderance of evidence, the record of the report of maltreatment should be amended from "indicated" to "unfounded" and sealed.

8

Judge McDonough's Order was upheld by John Franklin Udochi of the Bureau of Special Hearings, who has been designated by the Commissioner to make such decisions.  In upholding Judge McDonough's decision, Mr. Udochi wrote:

> The request of Margaret Murray that the Record of Reports (SCR Number 21603923) being maintained in the Central Register be amended to reflect that the Appellant is no longer identified as a subject of the reports is granted.  The Central Register and the Agency [i.e., the City's Agency] are directed to so amend the reports and to take the actions required by S.S.L. Section 422(9). (Union Exhibit 3)

As a result of this decision, the grievant was completely exonerated from all charges underlying her suspension.  Equity demands that the grievant be placed in the position she would have been, but for the suspension of her employment by the Employer on August 20, 2005, as the evidentiary record in the instant case established persuasively that the Employer was not obligated as a matter of law immediately and summarily to suspend the grievant pending adjudication of her case by the various governmental agencies with jurisdiction over allegations of child abuse or mistreatment.  NYCRR 418-1.10(b)(4) obligates a child day care center to:

> ...determine, on the basis of information it has available and in accordance with guidelines developed and disseminated by the Office, whether to retain or use the person as an employee...or to permit the person providing goods or services to have access to children being cared for by the child day care center.  Whenever such person is hired, retained, used, or given access to children, such center must maintain a written record, as part of the application file or employment or other personnel record of such person, of the specific reason(s) why such person was determined

9

to be appropriate and acceptable as an employee...with access to children being cared for by the center.

NYCRR 418-1.10(d) requires that the director or operator of a day care center "take such appropriate action as is necessary to ensure the health and safety of the children involved in the report and, as necessary, any other children in the care of the center." Nothing in this regulation mandates that all employees potentially culpable for an incident be suspended immediately and indefinitely until they are exonerated by the appropriate New York City or State authority. NYCRR 418-1.10(e)(1) explicitly provides for increased supervision, instruction or remedial counseling, or appropriate training where warranted as an alternative to disciplinary suspension or termination of employment. The Employer has not demonstrated any reason justifying the indefinite suspensions of Ms. Murray or the other grievants in the instant case.

Because the grievant was exonerated, she is entitled to be made whole for the losses suffered during her suspension, as the Employer voluntarily assumed the risk of such liability when the Employer suspended the grievant for such a lengthy interval. Having failed to demonstrate any basis supporting its suspension, the grievant is entitled to be made whole by the Employer.

10

At the arbitration hearing in the instant case, Grievant Murray testified credibly that, but for the suspension, she would have been employed at Highbridge in the full-time Assistant Teacher job she had accepted, as reflected in Union Exhibit 5, commencing July 25, 2005. Ironically, the grievant had agreed to delay beginning her new position until the start of the school year in September in order to accommodate a staffing shortage at Highbridge. Consequently, the grievant was on duty as a Group Teacher on August 19, 2005 when the incident that caused her suspension occurred.

The Employer asserted in a post-hearing submission that the grievant was offered only a temporary position as an ACD Assistant Teacher to replace Rose Lucas, who was scheduled to return to work from a leave of absence on October 15, 2005. According to the Union, Ms. Lucas did not return, and Ms. Murray would have been eligible to continue permanently in the position she was granted, with a hiring preference for the vacancy as a current part-time employee over new hires, unless she was discharged for cause. The Union's characterization of this situation was more persuasive than the Employer's in light of the documents in evidence and the regulations cited by the parties. Thus, Ms. Murray would have been working in the position she was offered in Union Exhibit 5, but for her suspension pending investigation. She was not an "at will" employee, as the Employer asserts, as the Employer's

11

prerogatives to dismiss her were limited by the collective bargaining

agreement regardless of the particular position to which she was

assigned.


According to credible testimony offered at the arbitration hearing,

the grievant would have earned $520.81 per week from August 20, 2005

through June 15, 2007, an interval of 94.5 weeks.  Therefore, the

grievant is entitled to gross back pay of $49,216.55, less an offset of

$5,538.00 representing unemployment benefits of $213 per week she

received for twenty-six weeks.   The grievant is also entitled to fifty-five

days vacation that would have accrued during the interval between

August 20, 2005 and June 15, 2007, when she commenced employment

with the New York City Department of Education.  The value of fifty-five

days vacation at the rate of $520.81 per week is $5,728.91, resulting in a

grand total due the grievant of $49,407.46, less customary payroll tax

deductions.  Such payment shall be made to the grievant forthwith.  The

grievant shall not be entitled to receive pre-judgment interest until the

date of this Award, but shall be entitled to receive post-judgment interest

following the effective date of this Award at the applicable statutory

judgment rate.

12

The grievant shall also be entitled to a recalculation of the amount due predicated on any retroactive wage increases that eventually may be negotiated between the Employer and the Union when ongoing negotiations for a collective bargaining agreement that will be retroactive to March, 2006 have been concluded.

The Arbitrator reserves jurisdiction to resolve any dispute that may arise regarding the computation or implementation of the remedy ordered pursuant to this Award.

II. Re: Group Teachers Vivian Byrd, Adrian Jones and Tyrone Sylvester

Group Teachers Byrd, Jones and Sylvester were suspended on December 5, 2005, following an investigation of the same August 19, 2005 incident for which Grievant Murray was suspended, and were reinstated on August 1, 2006. They claim back pay for this interval, giving rise to the instant grievance. The grievants testified credibly and under oath that they did not work elsewhere during the applicable intervals, as they were unable to find any work because their names appeared on the State Child Abuse and Maltreatment Register. The funding for their program expired shortly after they were reinstated in August, 2006.

13

A hearing was held before Administrative Law Judge

Paul S. McDonough.  Following this hearing in case FH Number

4483377P, John Franklin Udochi of the Bureau of Special Hearings held

on August 7, 2006 that:

> The request of Vivian Byrd, Linda Fergerson, Adrian Jones
> and Tyrone Sylvester that the record of reports (SCR Number
> 21603923) being maintained in the Central Register be amended to
> reflect that the appellants is (sic) no longer identified as a subject
> of the Reports is granted.  The Central Register and the Agency are
> directed to so amend the reports and to take the actions required
> by SSL Section 422(9).  This decision has been made by John
> Franklin Udochi, Bureau of Special Hearings, who has been
> designated by the Commissioner to make such decisions.

In conjunction with his decision, Mr. Udochi stated in his Findings of

Fact (Union Exhibit 2) that:

> The Agency's representative advised the Administrative Law
> Judge prior to the hearing that it had decided not to present any
> evidence in support of its indicated report with respect to these
> appellants.

Consequently, the Judge and Mr. Udochi held that:

> The Agency did not prove by a preponderance of evidence
> that the appellants committed the abuse and maltreatment
> alleged.  As the Report will be amended to reflect that the
> appellants is (sic) no longer identified as the subject of the Reports,
> the question of whether the abuse and maltreatment alleged is
> relevant and reasonably related to child care issues need not be
> addressed."

As set forth above, although the Employer was obligated by

applicable statute and regulations to report the incident, the Employer

was not obligated to suspend the three grievants summarily pending

investigation and adjudication of the claim by appropriate State agencies.

14

Consequently, the Employer assumed the risk that its suspension would be found to be baseless, and thereby incurred liability to make the grievants whole for salary and benefits they lost during the interval of their suspension.

Based on the sworn testimony and documents submitted at the arbitration hearing, the evidentiary record mandates a finding that Grievants Vivian Byrd, Adrian Jones, and Tyrone Sylvester were improperly deprived of earnings from the date of their suspension, December 5, 2005, through the date of their reinstatement, August 13, 2006.

Grievant Sylvester testified that he had received no unemployment benefits, and that he had no substitute interim earnings during this interval.    Grievant Byrd and Grievant Jones testified they collected unemployment insurance, but had no other substitute interim earnings. Union Exhibits 8 (A, B, and C) set forth in detail the lost earnings of each of the grievants.  Based on this evidence and the sworn testimony of each grievant, the Arbitrator finds that Grievant Byrd is owed $10,528.33 in lost wages attributable to the suspension, plus $1,057.50 in vacation, for a total of $11,585.83.  This amount shall be reduced by the unemployment benefits in the amount of $8491.00 received by Ms. Byrd, leaving a net due of $3094.83.

15

Grievant Jones lost salary of $10,341.93, plus vacation pay of $1,050.30 for a total due of $11,392.23, less an offset of $6266.00 for unemployment benefits received, for a net due of $5126.23.

Grievant Sylvester lost wages during the interval of his suspension in the amount of $11,423.50, plus vacation of $1,147.50, for a total due of $12,571.00, less an offset for unemployment benefits.  If Grievant Sylvester does not submit documentary evidence through the Union to the Arbitrator within twenty days after the effective date of this Award, a deduction of $5,538, representing twenty-six weeks at $213 per week unemployment benefits, shall be inferred as an offset.

The Employer's half of the Arbitrator's fee shall also be considered among the amount due and owing pursuant to this Award in any subsequent action to confirm or enforce this Award.

Therefore, based on the evidence submitted, Highbridge Advisory Council Family Services, Inc., the Employer, shall pay forthwith to Grievant Margaret Murray the amount of $49,407.46; to Grievant Vivian Byrd the sum of $3094.83, reflecting an offset for unemployment benefits received; to Grievant Adrian Jones the amount of $5126.23, reflecting an offset for unemployment benefits received; and to Grievant Tyrone

16

Sylvester the amount of $12,571.00, less an offset for any unemployment benefits he may have received during the interval of his suspension.  If Grievant Sylvester does not submit documentary evidence through the Union to the Arbitrator within twenty days after the effective date of this Award, a deduction of $5,538, representing twenty-six weeks at $213 per week unemployment benefits, shall be inferred as an offset.

The Arbitrator hereby retains jurisdiction for the purpose of resolving any dispute that may arise regarding the computation or implementation of the remedies ordered pursuant to this Award.

November 16, 2007                    Daniel F. Brent, Arbitrator

# EXHIBIT

# 3

AMERICAN ARBITRATION ASSOCIATION
LABOR ARBITRATION TRIBUNAL

---

In the Matter of the Arbitration Between

Highbridge Advisory Council River Park

and

Local 205, DC 1707, AFSCME

AAA Case No. 13 300 01086 06
Discharge of Linda Ferguson

---

## AWARD OF ARBITRATOR

The undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, AWARDS as follows:

Based on the evidence submitted, there was not just cause for the discharge of Linda Ferguson.  The discharge shall be reduced to a thirty-day unpaid suspension, and the grievant shall be made whole for all lost wages or work opportunity between December 15, 2005 and approximately August 6, 2006, less applicable offsets for unemployment benefits she received for twenty-six weeks during this interval and any welfare or other payments she received.

The Arbitrator hereby retains jurisdiction to resolve any dispute that may arise regarding the computation or implementation of the remedy ordered pursuant to this Award.

February 7, 2008


_____
Daniel F. Brent, Arbitrator

State of New Jersey
County of Mercer

On this 7th day of February, 2008 before me personally came and appeared Daniel F. Brent, to me known and known to me to be the individual described in the foregoing instrument, and he acknowledged to me that he executed the same.

An Attorney at Law of the
State of New Jersey

AMERICAN ARBITRATION ASSOCIATION
LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration Between

Highbridge Advisory Council River Park

and

Local 205, DC 1707, AFSCME

AAA Case No. 13 300 01086 06
Discharge of Linda Ferguson

Hearings were held in the above-entitled matter on

December 1, 2006 and January 30, 2008 at the offices of the Highbridge

Advisory Council Family Services Inc. located at 880 River Avenue,

Bronx, New York before Daniel F. Brent, duly designated as Arbitrator.

Both parties attended these hearings, were represented by counsel, and

were afforded full and equal opportunity to offer testimony under oath,

to cross-examine witnesses, and to present evidence and arguments.

The record was declared closed on January 30, 2008.

2

## APPEARANCES

For the Employer:

Rudyard Whyte, Esq., of The Cochran Firm

James Nathaniel, CEO

Wanda Carter, Site Director

Sherry Frazier, Personnel Administrator


For the Union:

Omar Joseph, Esq., of Kennedy, Jennik and Murray, Esqs.

Anthony Rios, Staff Representative


## ISSUES SUBMITTED

Was there just cause for the discharge of Linda Ferguson?

If not, what shall be the remedy?

3

## NATURE OF THE CASE

The grievant was suspended on November 15, 2005, and terminated effective December 6, 2005, from her position as a Group Leader in the Children's Pride Early Learning Center Day Care Center operated by Highbridge Advisory Council Family Services, Inc. following a recommendation by the New York City Administration for Children's Services Division of Child Protection that her employment be terminated. This recommendation was issued after two incidents in which the grievant was implicated for failure properly to supervise the children for whom she was responsible.  More particularly, the grievant was deemed to be culpable for failing to supervise a young boy who was injured during a back-to-school picnic celebration held on the facility's roof.  At the time of the injury, grievant was among three Group Leaders and three other adults who were supervising approximately ninety children. The grievant's name was eventually expunged from the New York State Child Abuse and Maltreatment Register after the City of New York Administration for Children's Services declined to oppose the grievant's request for expungement.

The grievant was also involved in a second incident on November 14, 2005 in which a child, among the group of approximately twenty children whom the grievant was supervising along with two other

4

co-workers, left the group as the children were returning to their classrooms and, despite having been denied permission, returned undetected back to the roof recreational area to retrieve a toy car that he had left there. After this second incident, in which the Administration for Children's Services determined that a potential finding that the grievant abused or maltreated a child by her failure to supervise was "indicated" by "some credible evidence", the Administration recommended that the grievant's employment be terminated. The Employer accepted this recommendation, and discharged whereupon the instant grievance was filed by the Union.

According to the Union, the Employer failed to conduct a thorough investigation of either incident, including interviewing, or obtaining statements from, the grievant. The Union asserts that, had such an investigation occurred, the grievant would not have been held culpable by the Employer because management would have more thoroughly understood the grievant's role in each of the incidents underlying her discharge, and her employment would not have been terminated. More particularly, the grievant contends that she did not know the child involved with the first incident, was supervising a different group of children at the opposite end of the large outdoor play area, did not observe the circumstances proceeding the injury or the treatment of the

5

child by a co-worker after the injury, yet was deemed to have been culpable for some shortcoming that has never fully been described.

The grievant acknowledged some responsibility regarding the second incident for the momentary disappearance of a child in her group, who returned to the roof play area without permission in order to retrieve a toy car. However, the Union contends that the penalty of discharge was excessively severe for such a momentary lapse of supervision. The grievant denies the child's contention that he was left on the roof, the premise upon which the Administration for Children's Services found cause to "indicate" improper failure to supervise. According to the grievant, the child recanted his accusation in front of several adult witnesses.

The Employer denied the instant grievance, and defended its decision to terminate the grievant as consistent with the recommendation of the impartial New York City Administration for Children's Services, which funds Highbridge Advisory Council's day care and related activities, and as necessary to preserve the funding and reputation of Highbridge Advisory Council. The Employer asserted that it had reasonably relied on the investigation conducted by the appropriate government agency, and that its action was neither arbitrary nor capricious.

6

The parties were unable to resolve their dispute within the grievance procedure, and the matter was brought to arbitration.

### DISCUSSION AND ANALYSIS

Two separate incidents were construed by the Child Protective Specialists from the New York City Administration for Children's Services as the bases upon which their recommendation to Highbridge Advisory Council that the grievant be discharged was predicated. However, no evidence in the record of the instant case ties the grievant in any way to the first incident, involving Jonathan S., who apparently became entangled in a rope during a tug of war contest, causing an abrasion to his neck. Another staff member intervened, and the child was treated for his injury.

The Employer reported the incident to the Child Abuse Hotline maintained by the New York State Office of Children and Family Services, and the Administrative Director of the Marshall England Early Learning Center interviewed the teacher involved and reported the result of the interviews to the New York City Administration for Children's Services (ACS). No one from Highbridge or from ACS interviewed the grievant

7

regarding this incident. Furthermore, no finding was made by ACS regarding this incident at the time.

The grievant was suspended on December 1, 2005 following an incident in which a child named Eric P. was allegedly left alone on the roof play yard.  The grievant was among three group leaders, two assistant group leaders and a parent volunteer who were supervising ninety children engaged in a back to school picnic activity on August 19, 2005  The grievant testified credibly, and without refutation, that she was engaged at one end of the play area in face painting and arm painting activities, during which she was surrounded by approximately twenty children waiting their turns to have their hands and arms painted, when a child approached and told her that a boy was crying and had been hurt.  The grievant testified that she rose immediately to investigate further, but desisted after she asked the child who brought the message where the injured child was and was told that Mr. Tyrone had taken the child downstairs for treatment.  The grievant appropriately resumed her hand painting activities, and maintained control of the twenty children in her immediate vicinity.

8

The grievant further testified that she did not know Jonathan S., the child who was injured; that she had no direct responsibility for this child as part of any discernible or defined group; and that she was unaware of his whereabouts or activities before he was injured. Nothing in the evidentiary record of the instant case substantiates any claim that the grievant should have intervened earlier to prevent Jonathan from being injured or that the intervention of any adult would have prevented the accident in which he was injured. Thus, the grievant was in no way culpable in connection with this incident.

The Employer did not undertake a thorough investigation, including a detailed interview of the grievant, of the grievant's involvement in Jonathan S's injury before reporting her involvement in the incident to the Administration for Children's Services. As a result of the Employer's failure to properly investigate, the grievant was unfairly and erroneously charged with failure properly to supervise. As a result, her name was included in the New York State Child Abuse and Maltreatment Register. Neither of these adverse findings was justified in light of the testimony adduced from management witnesses or from the grievant during the arbitration hearings. Consequently, the determination by the Child Protection Specialist from the Administration for Children's Services that the November 14, 2005 incident involving

9

Eric P. was the grievant's second instance of neglect of duty was predicated on an erroneous supposition.

The Employer established persuasively that it discharged the grievant in good faith reliance on the recommendation contained in a letter from the Administration for Children's Services. However, the Agency's determination was flawed because the grievant had been erroneously charged with culpability regarding the injury to Jonathan S. Unrefuted and credible testimony by the grievant demonstrated persuasively that she was not involved with Jonathan S., nor was she in any way directly responsible for the accident in which he was injured. If the Employer had conducted a thorough investigation of this incident, the Employer would have known that the grievant was not in the vicinity and had not been assigned responsibility for this child or the activity in which this child was involved when he was injured. Consequently, had the Employer properly discharged its duty to investigate, the Employer would not have referred the grievant's name as among the adult supervisors directly responsible for a potentially dangerous situation resulting in the injury to a child who was not actually in her charge.

The grievant was not suspended following the incident involving Jonathan S. She was, however, immediately suspended the day after the November incident involving Eric P. Because Eric P. was part of the

10

group for whom the grievant was responsible, the Employer had reasonable cause to suspend the grievant pending investigation and to impose discipline consistent with the facts.

The combined classes were accompanied by the grievant, who was leading the line of children, and two other staff members, who were bringing up the rear. The grievant testified credibly of her prior experience with Eric P. and his frequently disruptive behavior. For this reason, the grievant testified that she observed that he was missing from line immediately before they left the playground, and demanded that he get back in line. Moments after she saw him at the threshold of her classroom, she again observed that he was missing, and began to retrace her steps.

Before the grievant could leave the area or send another adult to search for Eric, the evidentiary record established that Eric was brought back to the classroom by a supervisor. They approached the grievant's classroom from downstairs, a direction that buttresses the grievant's contention that Eric went back to the playground to retrieve the toy car belonging to his friend and used the emergency exit leading downstairs as his path of egress, rather than coming back through the door leading directly from the playground toward the classrooms. In her testimony, the grievant emphatically denied having left Eric on the playground when

11

the combined classes went back to their classrooms, as Eric told the supervisor who discovered him on a lower floor as he tried to return to his class.  The grievant testified, again without refutation, that Eric admitted to her in front of the other staff members that he had not been left alone outside on the roof playground.

The Employer's reflexive compliance with a recommendation contained in a report generated by the Administration for Children's Services, the agency with responsibility for overseeing child safety in a day care setting is not immune from criticism.  Although such reliance may be understandable, the Employer's decision to discharge the grievant cannot be sustained in its entirety when the facts underlying the ACS recommendation ultimately prove to be other than as relied upon by the author of the ACS report.  Highbridge Advisory Council, as the Employer, was not required, either legally or pragmatically, to discharge the grievant in order to retain its funding or to preserve its relationship with government authorities. Notwithstanding a recommendation by the New York City Administration for Children's Services of by any New York State agency, the Employer has an independent obligation under the collective bargaining agreement between the parties to demonstrate that the termination of the grievant's employment was for just cause.

12

The Employer has acknowledged that the grievant was terminated because she engaged in two acts that were "indicated" by the Administration for Children's Services. The first of these acts has been completely and effectively refuted by the grievant. Nothing in the evidentiary record establishes that the grievant was in the vicinity of the location where Jonathan S. was injured, that she was involved or responsible for supervising the group with which he was playing, that the grievant had reason to know that an unsafe condition had arisen, or that the grievant was responsible other than for the group of approximately twenty children with whom she was engaged in an art activity on the opposite side of the play area. No culpability for the grievant with regard to the incident in which Jonathan S. was injured has been established by competent evidence. Consequently, no discipline may be imposed for this incident, and any discipline previously imposed that was substantially predicated on this incident must be disqualified or adjusted. Accordingly, given the Employer's reliance on the flawed conclusion of the ACS Case worker that the grievant had committed, or was culpable for, two "indicated" acts, the penalty of termination cannot be justified solely based on the grievant's involvement in the subsequent incident involving Eric P.

13

The grievant has acknowledged her responsibility as a group leader, along with two other employees, for assuring that all of the approximately twenty children in their charge were accounted for at all times. As one of the three adults charged with supervising the group, the grievant is at least partially at fault for permitting Eric P. to return to the roof play area. The evidence submitted by the Employer does not persuasively or definitively support a conclusion that Eric P. was left behind on the roof when the group exited back to their classrooms. If the evidence established such circumstance, then the grievant would be substantially more culpable because Eric was among the group of children for whom she had specific designated responsibility. In light of the proofs as they actually exist, however, the grievant's forthright testimony that Eric left the playground and then darted back from the hallway outside the classroom to the playground in order to retrieve his toy car is reasonable and must be credited.

Although the Employer has accurately portrayed the grievant's success in having her name expunged from the New York State Child Abuse Register as significantly different from achieving exoneration by reversing the initial indication made by the City's ACS agents, the grievant has, nevertheless, demonstrated that she was improperly charged for any culpability regarding the Jonathan S. injury. The record clearly reflects that this culpability was a significant factor in underlying

14

the Administration for Children's Services' recommendation that her employment be terminated.

The Employer bears the risk that the grievant would be exonerated either through the arbitration process or by the New York State or New York City agency responsible for overseeing the Employer's operations. But for the State's erroneous initial conclusion and the Employer's reflexive reliance on the ACS report citing the grievant for two instances of improper conduct, the grievant would not, or should not, have been discharged effective December 5, 2005. In light of all these circumstances, the maximum penalty that the Employer could reasonably have imposed for the grievant's involvement in this incident is a thirty-day suspension.

The grievant is entitled to be made whole to the extent that such a remedy can be fashioned. Thus, the grievant should have been suspended for not more than thirty days, and thereafter permitted to work for the Employer until her program ended on or about September 6, 2006. Consequently, the grievant shall be made whole by the payment of full back pay, accurately reflecting days she would have worked four hours and the days she would have worked eight hours, during the interval between her discharge and thirty calendar days prior to the end of her program. The Employer is entitled to credit for

15

applicable offsets attributable to the unemployment benefits and the other public welfare benefits that the grievant received during this interval.

The grievant testified that she was unable to find work in her customary occupation because of her name improperly appearing on the Child Abuse Register.  Her refusal to seek other work, while far from exemplary, does not mandate that she forfeit her right to back wages. However, the Arbitrator has effectively cut the Employer's liability for those back wages in half by crediting the Employer for all of the offsets for government benefits received, which might otherwise be subject to recoupment if the grievant were awarded full back pay.

Therefore, based on the evidence submitted, there was not just cause for the discharge of Linda Ferguson.  The discharge shall be reduced to a thirty-day unpaid suspension, and the grievant shall be made whole for all lost wages or work opportunity between December 15, 2005 and approximately August, 6, 2006, less applicable offset for unemployment benefits she received for twenty-six weeks during this interval and any welfare or other payments she received.

16

The Arbitrator hereby retains jurisdiction to resolve any dispute that may arise regarding the computation or implementation of the remedy ordered pursuant to this Award.

February 7, 2008         Daniel F. Brent, Arbitrator

# EXHIBIT

# 4

**AMERICAN ARBITRATION ASSOCIATION**
**CASES 13 300 00398 07 AND 13 300 00399 07**

In the Matter of the Arbitrations Between

**LOCAL 205, DC 1707**
**(Grievant Shirley Jarrett, Class Action) (AAA Case 13 300 00398 07)**

And

**PARADISE LEARNING DAY CARE CENTER**

**AND**

**LOCAL 205, DC 1707**
**(Grievant Wallace Bright) (AAA Case 13 300 00399 07)**

And

**HIGHBRIDGE ADVISORY COUNCIL**

_____

Decision of Arbitrator David L. Gregory
July 30, 2007

1

**Appearances:**

**For the Union** Local 205, DC 1707, 75 Varick Street, NY, NY 10013: Mr. Thomas M. Murray, Esq., Kennedy, Jennik & Murray, 113 University Place, NY, NY 10003, 212.358.1500, 0207 fax

**For the Employers** Paradise Learning Day Care Center, 258 East 165th Street, Bronx, NY 10456; and, Highbridge Advisory Council, CEO James Nathaniel, 880 River Avenue, Bronx, NY 10452: Mr. Rudyard F. Whyte, Esq., The Cochran Firm, 5th Floor, 233 Broadway, NY, NY 10279, 212.553.9145, 212.227.8763 fax

N.B. A May 29, 2007 post-hearing brief and a June 21, 2007 fax were the only documents submitted by the Employers. Neither Employers nor their counsel appeared at the May 18, 2007 and June 21, 2007 arbitration hearing.


## DECISION AND AWARD


**Background Introduction**


I am the Arbitrator selected by the parties through the auspices of the American

Arbitration Association.


The Employer, despite full and timely written notices from the AAA, did not

appear at the scheduled arbitration hearings on May 18, 2007 and June 21, 2007.


The May 18, 2007 hearing, devoted exclusively to whether the grievances are

arbitrable, proceeded ex parte in a conference room at the offices of the AAA, 10th

Floor, 1633 Broadway, NY, NY 10019, and in accordance with AAA Rule 27. Union

2

counsel presented twelve Union exhibits, all of which were admitted into the evidence of record. Grievant Wallace Bright was sworn in, and he testified under oath in response to questions from Union counsel and from me as the Arbitrator, with all questions at the May 18, 2007 hearing relating solely to arbitrability.

Pursuant to my ruling at the hearing on May 18, 2007, and pursuant to my request, the AAA immediately thereafter informed the Employers and the Union of their right to file briefs on the issue of arbitrability by May 29, 2007. The parties filed briefs dated May 29, 2007, and the briefs were forwarded to me by the AAA in an envelope postmarked June 4, 2007. I completed receipt on June 7, 2007. The Union discussed both of the grievances in its brief. Employer counsel briefed only with respect to the arbitrability of the grievance in AAA case 13 300 00398 07 (Paradise Learning Day Care Center); Employer counsel's brief addressed nothing whatsoever with respect to AAA case 13 300 00398 07 (Highbridge Advisory Council, and the Union's grievance on behalf of Grievant Wallace Bright).

On June 9, 2007, I issued my nine page written Decision and Award solely with respect to the arbitrability of the two grievances. I found both grievances arbitrable, and I set June 21, 2007 as the date for the hearing on the merits of the grievances. My June 9, 2007 Decision and Award is incorporated herein by reference.

The Union appeared and presented Grievants Wallace Bright and Shirley Jarrett as its sworn witnesses, and reconfirmed its exhibits, at the arbitration hearing on the

3

merits of the grievances on June 21, 2007 at 10 A.M., as scheduled, at the offices of the AAA, 10th Floor, 1633 Broadway, NY, NY 10019. The Employer did not appear, and the hearing proceeded ex parte pursuant to AAA Rule 27. At 11:30 A.M., AAA Case Manager R. Nath hand-delivered to Union counsel and to me a fax from Employer Counsel. I accepted the Employer's fax into the record.

Pursuant to my instruction, the AAA, by its June 27, 2007 letter, informed the parties' of their right to file post-hearing briefs. I received the Union's July 9, 2007 post hearing brief through the AAA auspices on July 27, 2007. On July 26, 2007, the AAA informed me that it had not received any post-hearing brief from the Employer following the June 21, 2007 ex parte hearing.

**The Positions of the Parties**

**The Position of the Union**
**Re: Grievant Wallace Bright**

Grievant Wallace Bright testified that he was a teacher's aide in the pre-school program and an assistant group leader in the school-age program, with his time divided roughly equally between the two functions.

4

What was ultimately deemed to be an unfounded allegation of child abuse at the

Employer's facility occurred in November, 2005. The Grievant was indefinitely

suspended, and his last day of work was February 3, 2006. His grievance was timely filed

on February 28, 2006.

The Union maintains that the Grievant was suspended and terminated without just

cause, and that the Employer thus breached the Article XII, Section 1 "just cause"

provision of the collective bargaining agreement.

The Union maintains that Grievant Bright was unable to attend the April 3, 2006

mediation due to medical complications occurring during his wife's difficult pregnancy,

that he timely so advised Union Staff Representative Edna Rivera, and that Ms. Rivera, in

turn,  timely so advised Mediator Jay Nadelbach and the Employer. According to the

Union, since the mediation was not planned and scheduled to take place, the mediation

could not have been declared closed. In any event, the grievance cannot be foreclosed due

to a compelling family medical situation that precluded the Grievance from appearing at

the mediation. The Grievant's wife delivered twins on June 16, 2006. He repeatedly, but

unsuccessfully, sought employment subsequent to his February 3, 2006 last day of work.

Unless and until his grievances are successfully resolved, however, his search for

employment remains substantially compromised. Few, if any, employers are willing to

hire anyone suspended or terminated by their previous Employer due to alleged child

abuse at work. According to the Grievant, Director Julia Cannady told the Grievant that

this was the case, in May, 2006. He received unemployment compensation, and he eventually found part-time work at Home Depot effective May 13, 2007.

On January 31, 2007 and on February 23, 2007, the State of New York Office of Children and Family Services granted Mr. Bright's request that the allegations of child abuse against him be deemed unfounded. (Union Exhibits 8 and 9).

The Union cites the March 21, 2004 decision by Arbitrator Barbara C. Deinhardt, Esq., finding that, in analogous circumstances, "the precipitating event giving rise to the grievance was the decision of the Employer not to reinstate [Grievant[ Obi following the decision of the State overturning the ACS 'indicated report' and sealing Obi's record and that the time limits run from that date." <u>Bedford Avenue Day Care Center v. Local 205, DC 1707, AFSCME</u> (Arbitrator Barbara Deinhardt, March 21, 2004) Consequently, in the present case, "since the Union's [February 15, 2007] demand for arbitration (Union Exhibit 3) was made within 30 days of the Employer's refusal to reinstate Bright or mediate the dispute, it is arbitrable." ( Union's May 29, 2007 brief on arbitrability at 3)

The Union summarizes: "…the Employer failed to show up to present any evidence for suspending [Grievant Wallace] Bright indefinitely and refusing to reinstate him after he received a favorable decision from the State of New York Office of Children and Family Services. Bright received the decision, dated February 1, 2007 from OCFS finding that the allegations against Bright were unfounded." (Union's July 9, 2007 post hearing brief at 2). The Union requests the make-whole reinstatement remedy, and

further elucidates: "The Union requests that Bright receive full back-pay for full-time hours up to September 2006, when the Employer closed its school age program....For the period after September 2006, Bright should receive part-time pay of four (4) hours per day. In addition, the arbitrator should order interest for the period after February 1, 2007, after which time the Employer had no legitimate reason not to reinstate Bright." (Union's post-hearing brief at 2)

### Re: Grievant Shirley Jarrett, on behalf of the Class

With respect to the grievance in AAA Case 13 300 00398 07, the Union emphasizes that the face of the grievance asserts that the Employer violated Article XI (Health, Safety, and Welfare) of the collective bargaining agreement. The grievance provision is broadly written, per Article XV, Section 1. Article XVII Management Rights recognizes that the Employer must "comply with the policies establish[ed] by ACS for reimbursement to the agencies." (Union's May 29, 2007 brief on arbitrability at 3). "...thus, the question of whether the Employer's refusal to hire a teacher's aid[e] in a classroom when ACS has budgeted money for that purpose has resulted in a breach of Articles XI and XVII clearly falls within the scope of the arbitration provision of the CBA." (Union's May 29, 2007 brief on arbitrability at 4).

At the June 21, 2007 hearing on the substantive merits of the Class Action grievance, Grievant Shirley Jarrett testified that she worked for several years without a

part-time teacher's aide in her classroom. Despite her many unanswered inquiries, the position remains unfilled. Director G. Hodges informed her that this was a staffing decision by the CEO.

The Union summarizes: "She [the Grievant] was continually required to work short-handed, despite the fact that this left her classroom out of compliance with the applicable City and State regulations. Indeed, Jarrett was the only teacher in the pre-school program who had to work without both an assistant teacher and teacher aide." (Union's July 9, 2007 brief at 2).  The Union contends that the Employer's deliberate disregard of the law, coupled with its capricious refusal to respond to Grievant Jarrett's many inquiries, compels me to order the Employer to immediately fill the vacant position of the teacher's aide.

**The Position of Employer Highbridge Advisory Council**
**Re: Grievant Wallace Bright**

By June 21, 2007 fax letter with attachments, the Employer asserts that documents previously submitted to the AAA show that "Mr. Bright and the Union have exhausted their available remedies as they failed to timely request arbitration of this matter after having failed to appear for arbitration (sic) [mediation] over ten months ago. We [the Employer] therefore will not engage in any arbitration in this matter..." (February 22, 2007 letter from Employer attorney Rudyard F. Whyte, Esq. to Union

8

attorney Thomas M. Murray, Esq.), and with copy of same accompanying June 21, 2007

Employer fax)

By March 9, 2006 letter to Employer Marshall England Day Care, Union Staff

Organizer Edna Rivera requested mediation of the grievance filed on behalf of Grievant

Wallace Bright. By March 13, 2006 letter to Highbridge Advisory Council CEO James

Nathaniel and to Union Staff Representative Edna Rivera, Mr. Jay Nadelbach, Esq.,

Director, Labor Relations and Mediation Service for the parties, informed the parties that

mediations of Ms. Linda Ferguson's and Mr. Bright's grievances were scheduled for

Monday, April 3, 2006 at 10:30 a.m. at the Day Care Council Offices.

By April 3, 2006 letter, Director Nadelbach informed the parties that his letter

"confirms that mediation sessions scheduled today...were not held based upon the fact

that neither Grievant appeared. The mediation was to take place at 10:30 a.m.. The parties

(both Ms. Rivera and two Employer representatives) waited for over one hour before the

meeting was called off. In view of the Grievant's nonattendance, the grievance-mediation

step is declared closed. The Union now has thirty (30) calendar days to file for arbitration

or the grievances shall be deemed resolved, with no further prosecution available. It is my

recommendation, based upon the Grievants' failure to participate in the grievance

process, that the Union's Grievance-Committee drop these cases and not process them to

arbitration."

9

By January 31, 2007 letter to Highbridge Advisory Council CEO Nathaniel, the Union (re)requested mediation of, inter alia, the February 28, 2006 grievance regarding Wallace Bright, stating further that "the Union request for Mediation dates are back to March 9, 2006....these grievances are past due for Mediation." (Union Exhibit 5)

By February 7, 2007 letter, CEO Nathaniel replied to Union Staff Organizer Rivera's January 31, 2007 letter, reiterating to the Union that Mr. Bright "failed to appear for the [April 3, 2006 scheduled mediation] meeting" and citing Director Nadelbach's April 3, 2006 letter to the effect that "the matter is deemed resolved." (Union Exhibit 6)

By February 13, 2007 letter, the Union requested arbitration. By February 16, 2007 letter, Director Nadelbach informed the parties that "based on the Employer's [February 7, 2007 letter] response [to the Union's January 31, 2007 letter], I will not be scheduling a mediation session. The Union is, therefore, free to determine its position and take whatever action it deems appropriate." (Union Exhibit 7)

For all of these reasons, Employer Highbridge asserts that it "will not engage in any arbitration on this matter..." (Mr. Whyte's February 22, 2007 letter to Mr. Murray)

10

**The Position of Employer Paradise Learning Day Care Center**

**Re: Grievant Shirley Jarrett, and the Class**

The Employer's May 29, 2007 brief, on the issue of (non)arbitrability of the grievance in AAA case 13 300 000398 07 regarding Local 205, DC 1707 and Paradise Learning Day Care Center, asserts that Article XVII Management Rights completely and unequivocally trump the Union's transparent and unsuccessful endeavor to cast this grievance as an Article XI "Health, Safety, and Welfare" issue that purports to require as remedy that the Employer hire additional personnel. Article XVII Management Rights plainly entitle the Employer to "reorganize its activities and staff at its discretion and such decisions are not to be subject to the grievance procedure or to arbitration."

The Employer contends that none of the provisions within Article XI's several sections appear to have any bearing whatsoever on the Union's specious invocation of Article XI to trump Article XVII Management Rights. The Employer summarizes: "Although this dispute has been couched as a safety issue, any fair reading of the express language of the subject agreement requires that such an argument fail. The dispute here centers around the staff assigned to a particular classroom. Staff assignment is not an issue that falls within any of the enumerated sections within Article XI. This dispute is borne exclusively out of different opinions regarding staffing—said decisions being a right expressly retained by the Employer and one that is not subject to the grievance and arbitration process....Examining the CBA on its face, it is clear that issues of staffing and correlating decisions regarding assignment of teachers are rights exclusively reserved by

11

the Employer under Article XVII, and rights that are expressly not subject to the grievance dispute and resolution by arbitration....the Employees cannot establish a threshold right to arbitration on the issue of classroom coverage. It is evident from the plain language of the Collective Bargaining Agreement that the Employer explicitly and expressly reserves the rights to staff its center and assign its teachers as it sees fit, and that such decisions are not subject to the grievance and arbitration process. Furthermore, it is clear that nothing within Article XI makes this dispute subject to an arbitration proceeding. " (Employer's May 29, 2007 brief on arbitrability at 3-4)

**Analysis and Discussion**

I have carefully read and studied the collective bargaining agreement (Union Exhibit 1), all of the Exhibits, and the briefs and authorities therein cited by the parties. I incorporate by reference my June 9, 2007 Decision and Award, finding that both of these grievances are arbitrable.

I now render this present Decision and Award on the substantive merits of these two grievances. I do so pursuant to law, the collective bargaining agreement, the rules of the AAA, the parties' May 29, 2007 briefs on arbitrability, the Employer attorney's June 21, 2007 fax, and the Union's July 9, 2007 post-hearing brief.

12

**Re: Grievant Shirley Jarrett, and the Class Action (Case 398-07)**

The Employer is certainly correct, in so far as grievances can not indiscriminately purport to vitiate Article XVII Management Rights simply by clever headings and captions. For the reasons set forth below, I find that the Employer's actions are within its Article XVII Management Rights, and that neither Article XI Health, Safety, and Welfare, nor any pertinent law has been violated.

Ms. Jarrett was a knowledgeable and credible witness. She has been a classroom teacher for fourteen years; since 2006, she is also the Union Steward.

Each of the five classrooms at the Paradise Learning Center have one full time teacher and one part time teacher. With the exception of Ms. Jarrett's classroom, however, all of the four other classrooms also have a part time teacher's aide. This has been the situation since at least 1999. In recurring conversations with Employer Director G. Hodges, Ms. Jarrett testified that she has been repeatedly told that she and her classroom would not be getting a teacher's aide, and that this was a staffing decision by the Employer's CEO.

Consequently, without a teacher's aide, Grievant Jarrett has no one to assist her from 7:30 A.M. until 10 A.M., when as many as five children are already present in her classroom. However, she also testified that the Director at the facility ensures that an aide is present in the event that neither Ms. Jarrett, nor Margaret, her part time teacher

colleague, are present. She testified that Margaret and she have an excellent working relationship.

Ms. Jarrett further testified that an official from the health department visited the facility, including her classroom, in June, 2007. When asked by the inspector whether she had a teacher's aide, she replied "No"; the inspector said "OK" and made written notes.

In response to my questions to Ms. Jarrett at the arbitration hearing on June 21, 2007, she testified that there has never been a reportable accident in her classroom.

I find that the Union has not met its burden of proving that the Employer has breached the collective bargaining agreement or has violated pertinent law.

While the Employer failed to prove that the grievance is not arbitrable, that insufficient proof of nonarbitrability by the Employer is not sufficient to thereby constitute affirmative proof that the Union has met its burden of proof on the substantive merits.

Ms. Jarrett's testimony very credibly evidences her excellent work, her knowledgeable substantive experience consonant with fourteen years of service, and her harmonious coordination with her colleague Margaret in managing her classroom. I find insufficient evidence that the collective bargaining agreement or pertinent law unequivocally mandate a part time teacher's aide in this classroom in these

14

circumstances. On the contrary, I find that the collective bargaining agreement supports the Article XVII management right of the Employer to maximize its operational efficiency.

Grievant Jarrett's forthright testimony was credible and unequivocal---there has never been a reportable accident in her classroom. This substantially vitiates the Union's grievance assertion that Article XI "Safety in the classroom" (Union Exhibit 2) was adversely affected by the Employer's staffing choices.

### Re: Grievant Wallace Bright (Case 399-07)

Jay Nadelbach is one of the premier arbitrators and mediators in the country. I have great respect for him and for his professional abilities, as a fellow member of the National Academy of Arbitrators. The parties understandably have institutionally vested him with great authority in the resolution of grievances.

Initially, it appears that Grievant Bright irresponsibly failed to appear at his scheduled April 3, 2006 mediation. He kept everyone waiting, including the Union and Employer representatives, and Mr. Nadelbach, for over an hour. There is no written contemporaneous evidence that Mr. Bright timely informed anyone that he was unable to attend the mediation on April 3, 2006, due to his wife's medical complications during her

15

difficult pregnancy. Mr. Bright forthrightly and unequivocally testified that he did timely

inform his Union representative; if so, it is therefore very troubling that the Union does

not mention whatsoever any alleged timely notice, by Mr. Bright on April 3, 2006, in any

of the considerable subsequent written correspondence. It seems that the Grievant and/or

the Union forfeited its April 3, 2006 mediation opportunity, did not timely pursue

arbitration within thirty days thereafter, and now nevertheless audaciously seek a

proverbial, but prfoundly untimely, second bite at the apple.


If this were all that the Employer, or Mr. Nadelbach, or me, for that matter, had

before them, the Bright matter would appear resolved by his apparent April 3, 2006

forfeiture of his right to mediation and, after early May, 2006, to arbitration..


There is no evidence in this arbitration, however, that Mr. Nadelbach had before

him on February 16, 2007, when he wrote to the Union, the January 31, 2007 letter from

the New York City ACS (Union Exhibit 8) stating that "a decision has been made not to

proceed against" the Grievant. And, obviously, on February 16, 2007, Mr. Nadelbach

could not, and did not, have before him the February 23, 2007 Decision by the New York

State OCFS granting Mr. Bright's request that the record regarding the alleged abuse in

November, 2005 be "amended to unfounded and sealed." (Union Exhibit 9).


There is no evidence before me that Mr. Nadelbach had the benefit of having

before him either of these important documents when he issued his February 16, 2007

letter; neither Union Exhibit 8 or 9 was attached to the Employer's June 21, 2007 fax to

16

me, although the Employer's June 21, 2007 fax did replicate via one fax attachment one document that was already in evidence in this case as Union Exhibit 6 (Mr. Nadelbach's February 16, 2007 letter.)

Instead, Mr. Nadelbach's February 16, 2007 letter response to Union Staff Representative Rivera states that he is in receipt of the Employer's February 7, 2007 letter response to the Union's January 31, 2007 letter request for mediation. Mr. Nadelbach further states in his February 16, 2007 letter: "Based on the Employer's response, I will not be scheduling a mediation session. The Union is, therefore, free to determine its position and take whatever action it deems appropriate."

His letter makes no mention whatsoever of the government documents of January 31, 2007 or of February 23, 2007.

In the present case, I, unlike Mr. Nadelbach, have the advantage of having those very important government documents in the record before me, as well as the March 21, 2004 decision of Arbitrator Barbara C. Deinhardt (Union Exhibit 10) determining that the "precipitating event giving rise to the grievance was the decision of the Employer not to reinstate" the Grievant following the January 31, 2007 and February 23, 2007 governmental decisions.

There is no doubt whatsoever that the Grievant and the Union timely demanded his return to work after he was cleared by these governmental authorities. The Employer

17

rejected those timely demands, instead relying on the Grievant not attending a mediation on April 3, 2006, many months before the governmental authorities issued these January 31, 2007 and February 23, 2007 documents.

Unless and until the governmental authorities concluded their work, it is probably highly unlikely that any prior mediation or arbitration or other form of alternative dispute resolution would have immediately restored the Grievant to employment without regard to the then concurrent and still-open governmental investigative and administrative processes regarding the November, 2005 allegation of child abuse at work by the Grievant.

The Employer's theory of the case would nullify the "just cause" provision of the labor contract, and leave the Grievant jobless, without due process, and without recourse whatsoever. The Employer would also completely ignore the Deinhardt decision, which sets forth the controlling chronological formula in the analogous case.

The fact that the Grievant did not attend the April 3, 2006 mediation, for whatever reason, does not automatically preclude the Grievant from demanding to be returned to work after the government's February 23, 2007 decision. Mr. Nadelbach's February 16, 2007 letter does not order the Union not to pursue this arbitration. His letter makes no reference to the January 31, 2007 ACS letter, nor to the Deinhardt decision.

With the January 31, 2007 and February 23, 2007 government documents and the Deinhardt decision now in the evidence of record in this case before me, I find that the Deinhardt chronological calculus is controlling in this case.

I find that the Employer failed to prove that it had Article XV, Section 1 just cause to keep the Grievant from returning to work after February 23, 2007.

## AWARD

For all of the reasons set forth above in this Decision and Award:

Grievance 398-07 is denied.

Grievance 399-07 is granted in part and denied in part.

Grievant Wallace Bright shall be reinstated and the penalty shall be expunged from the record.

Because I find insufficient evidence that the Grievant timely and contemporaneously notified the Union or the Employer that he was unable to attend the April 3, 2006 scheduled mediation due to medical complications in his wife's difficult pregnancy (if he had done so, his assertion would, in all probability, have surfaced much earlier in the paper trails), and because he, by his testimony, has been a primary child

19

care giver subsequent to the children's birth on June 16, 2006 and not effectively in the job market, and because he received unemployment compensation, I find that the award of back pay shall commence on February 24, 2007, one day after the issuance of the decision by Steven M. Connolly, Bureau of Special Hearings, State of New York, Office of Children and Family Services (Union Exhibit 9). The award of back pay commencing February 24, 2007 shall be offset by any interim earnings since that date.

I do not find any bad faith on the part of the Employer. Therefore, the Union's claim for interest on the back pay award is denied.

DAVID L. GREGORY

I, David L. Gregory, upon my oath as Arbitrator, affirm that I have executed this document as my Decision and Award in this matter on this 30th day of July, 2007.

DAVID L. GREGORY

20